# BALTIMORE BOOT AND SHOE MANUFACTURING CO. *vs*. JAMES D. JAMAR.

*Liability of Contractor for Labor of Convicts to a Convict for Injury Caused by Defective Appliances—Master and Servant—Workman Injured by Fall of Elevator—Instructions to the Jury—Contributory Negligence.*

When a manufacturer contracts with the State for the labor of convicts in the penitentiary in carrying on a business, the relation of master and servant, to its full extent, does not exist between the contractor and a convict, because the labor imposed upon the convict is involuntary servitude, and the control over him by the contractor is limited.

But the liability of such contractor to a convict is the same as that of a master in respect to those incidents of the employment over which he has the same control that a master ordinarily has.

Defendant company contracted with the directors of the penitentiary for the use of certain buildings and the labor of a certain number of convicts in manufacturing shoes. A freight elevator was constructed by defendant against the outer wall of the factory building. The elevator was built inside a timber frame and sheathed with boards except that on one side the sheathing ended nine feet from the ground, and there were windows in it on that side. The elevator was operated by an endless rope on one of the sheathed sides, where there was a hole in the sheathing. The evidence was conflicting as to whether the elevator could be operated through this hole by one standing outside, or whether it was necessary to stand under it to pull the rope and then get out before it reached the ground. Plaintiff, a convict, was assigned by the warden to operate this elevator. On the day of the accident, a truck became jammed between the descending elevator and the second floor of the building. When it was taken out, the elevator fell upon the plaintiff, who was standing below, and he thereby received the injury for which this action was brought. The safety pawls with which the elevator was supplied failed to work on this occasion. *Held,*

1st. That the defendant should be held liable if the injury plaintiff suffered was caused by lack of reasonable care in the construction or maintenance of the elevator.

2nd. That the conflict of evidence as to whether the sheathing of the elevator prevented its operation from the outside or not, presented an issue of fact as to whether its construction was proper or not.

3rd. That the jury was entitled to pass upon the question whether the defendant's inspection of the elevat o     made with ordinary care.

4th. That an instruction to the jury that the plaintiff was entitled to re-
cover if they found that the accident was caused by a defect in the ele-
vator which could have been discovered previously if defendant had ex-
ercised ordinary care in inspecting it, or if the accident was caused by
reason of the faulty construction of the elevator, was properly granted,
and there was evidence legally sufficient to sustain the hypothesis of the
instruction.

5th. That the jury was properly instructed that the plaintiff was not guilty
of contributory negligence in going underneath the elevator, if it was
necessary for him to do so to operate it and he was compelled as a con-
vict to perform that duty, but he was guilty of contributory negligence
if he could have operated the elevator without going under it, or if, be-
fore he went under it at the time of the accident, he saw that it was
caught by a truck at the second floor, or if, after he got under it, he
heard calls to him to stand from under and did not heed them.

Appeal from the Superior Court of Baltimore City (HAR-
LAN, C. J.) The jury returned a verdict for the plaintiff for
$4,000, on which judgment was entered.

*Defendant's 5th Prayer:* If the jury shall find from the evi-
dence that the injury complained of in this case was caused by
the elevator falling upon him after it had been released from
the truck upon which it had caught as testified to by Vincent
Stewart, and shall further find that while said truck was caught
under said elevator and before Peacock, the convict mentioned
in the evidence of said Stewart, extricated the same from
under the elevator, the said Peacock, or the convict, John
Pollard, named in the evidence of the said Stewart, called to
the plaintiff, to stand from under the said elevator and that the
plaintiff heard such call, but did not heed the same, and so re-
ceived the injuries complained of, then the verdict of the jury
must be for the defendant, even although the jury shall fur-
ther find that some part of the safety-clutch machinery of the
elevator was out of order at the time of the accident, and that
if it had been in order the elevator would not have fallen on
the plaintiff, and even although the jury shall further find that
the rope used to bring down the elevator could not have been
reached by the plaintiff except by going under the said eleva-
tor. (*Granted.*)

*Defendant's 6th Prayer:* If the jury shall find from the evi-

dence that on the day of the accident to the plaintiff, the convict Peacock was bringing the elevator from the third floor of the building mentioned in the evidence, down to the second floor of the said building, and had with him on the floor of the elevator a truck as testified to by the witness Stewart ; and that while in so bringing it down, he jumped from the floor of the elevator to the second floor of the building before the floor of the elevator reached the said floor of the building, and attempted at the same time to pull the truck with him, and that in so doing the wheels and front part of the truck caught under the floor of the elevator and between it and the floor of the building, and that thereupon Peacock worked to get said truck from under said elevator and first got one of the wheels free, and then got the other wheel and the other part of said truck which had been caught under the elevator, free, and that thereupon the elevator fell on the plaintiff while he was standing under the elevator on the ground ; and if the jury shall further find that the plaintiff before going under the said elevator saw the elevator floor, with the truck under it, after the elevator had been stopped at the second floor of the building by being caught by the truck in the manner hereinbefore set forth, and then went under the elevator while it was so caught, and when he knew it was not safe to do so, and it fell upon him as soon as it was released from said truck, then the plaintiff so directly contributed by his own negligence to his injuries as to prevent recovery in this action, and the verdict of the jury must be for the defendant, even although the jury shall also find from the evidence that the safety-clutch appliances of the elevator were not in proper order at the time of said accident, and that if they had been in order the elevator would not have fallen on the plaintiff, and even although the jury shall further find that no sufficient opening existed at the time of the accident in the side casing of the elevator to enable the plaintiff to reach the rope used for bringing the elevator down from the upper floors to the ground. (*Granted.*)

*Defendant's 7th Prayer*: That the defendant is in no way re-

sponsible for any act, or for any negligence of the convict, Peacock, mentioned in the evidence, in connection with the elevator upon the day of the accident. (*Granted.*)

*Defendant's 8th Prayer:* If the jury shall find from the evidence that the elevator was constructed in the year 1889, by James Bates, a builder of elevators in the City of Baltimore of established reputation and character, upon the plan and with the appliances usual in said elevator, and proper for the same, and after its construction, and upon putting it into operation, the defendant employed the witness, Marshall, whose duty it was made by the defendant to examine frequently each week, and almost daily the several parts of said elevator, including the safety-clutch machinery, and that he was competent for the discharge of these duties, and it was also made his duty to report to the defendant any defect which he should discover in the said elevator or its machinery, and that said Marshall was in the discharge of these duties from the time of the beginning of the operation of the elevator up to the day of, and on the day of said accident to the plaintiff; and that on the morning of said accident and before it happened, he had examined all parts of the said elevator, including the safety clutches, and upon said examination believed them to be in order; then the defendant is not responsible in this action for any defect which may have existed at the time of the accident in the safety-clutch appliances, even if the jury find any such defect was the cause of the fall of the elevator; provided the jury shall further find that the said Marshall made said examination on said day in good faith and with ordinary care and diligence. (*Granted.*)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Bernard Carter* and *Charles H. Carter* for the appellant.

*Thos. Ireland Elliott* (with whom was *Harrison W. Vickers* on the brief), for the apppellee.

SCHMUCKER, J., delivered the opinion of the Court.

The appellee sued the appellant company in the Superior Court of Baltimore City for damages for injuries sustained by him, while he was a convict in the Maryland Penitentiary, from the falling of an elevator attached to the shoe factory in that institution.   The verdict and judgment were against the appellant and it appealed.   The record contains but one bill of exceptions and that relates to the action of the Court upon the prayers.

There was evidence tending to prove the following state of facts.   The appellant in 1889, contracted with the directors of the penitentiary for the use of certain buildings and the labor of a given number of convicts, without specifying any particular ones, for the purpose of manufacturing boots and shoes. The buildings were inside of the penitentiary walls and the convicts whose labor was hired remained subject as convicts to the rules and discipline of that institution and continued in its custody and were watched by its deputy wardens and guards even while engaged at work in the factory.   The selection of the particular convicts who were to labor under the appellants contract and of the class of labor which each one was to perform was made by the warden in obedience to sec. 467 of Art. 27 of the Code.

The appellant erected the elevator for the convenience of its manufacturing operations with the consent of the prison authorities.   It stood against the outside of the south wall of the factory building and communicated with the interior of the building at its second and third floors.   It was an ordinary freight elevator constructed inside of a frame of timbers and it was erected by James Bates an experienced builder of elevators.   After Mr. Bates had finished the elevator the appellant caused it to be entirely sheathed with boards on its east and west sides and to be similarly sheathed on its north side from its top down to within about nine feet of the ground. There were windows in the sheathing on the north side through which, and the opening below them, the position of the elevator could always be seen from the yard on that side of the structure.

The elevator was raised and lowered inside of the sheathed frame by a wire cable which was operated from a drum located inside of the factory building. This drum was set in motion and stopped by means of two shifting ropes, which were so connected as to form an endless rope, suspended inside of the west side of the elevator sheathing, where there also hung a check rope by pulling which the elevator could be stopped at any point. At the place where these ropes hung a hole was cut through the sheathing four or five feet above the ground and within a few inches of the factory building. There was a positive conflict of testimony concerning the size and purpose of this hole and the possibility of operating the elevator through it by one standing outside of the sheathing.

Five witnesses for the appellee of whom three had operated the elevator and the other two had often seen it in operation testified that this hole was only used to tap a signal bell, that you could barely get one hand through it and that it was impossible for one standing outside of the sheathing to operate the elevator through the hole. They further testified that the elevator was always operated from inside of the sheathing and that when it was in the upper part of the frame it was necessary to stand underneath it to pull the shifting ropes to lower it. The appellee further testified that when he was first assigned to operate the elevator the appellant's manager explained to him how to use it and in doing so went inside the sheathing underneath the elevator and from that position pulled on the shifting ropes to lower it and walked out before it reached the ground and also told him that there was no danger in it; and that Marshall who oiled and cared for the elevator told him that it had safety clippers on it and it would not fall if the cable broke or slackened. Seven witnesses for the appellant all of whom had either operated the elevator or frequently seen it in operation flatly contradicted the appellee's witnesses as to the possibility of operating the elevator from the outside through the hole in the sheathing, and said that it not only could be operated in that manner with ease and safety but that it was currently so operated.

After the contract between the appellant and the prison authorities had been in operation for sometime the appellee was convicted and sentenced to the penitentiary for manslaughter and was assigned by the warden to labor under that contract. He was at first put to work inside of the factory, but was in November, 1891, assigned by the warden to operate the elevator, which he continued to do until February 27th, 1893, when having gone inside of the sheathing for the purpose of lowering the elevator the latter suddenly fell upon him and dislocated his spine and greatly injured him.

Immediately prior to the accident a convict named Peacock, who had also been assigned by the warden to work in the appellant's factory, was bringing a truck down on the elevator from the third to the second story. When the elevator had nearly reached the second story he jumped off, but through his careless handling of the truck it was jammed between the second floor of the factory and the descending elevator which was thereby stopped and held fast. The drum continuing to revolve the cable was slackened and when the truck was extricated the elevator fell upon the appellee. The elevator was provided with safety pawls, operated by a spring, which were intended to automatically enter ratchets on the guide posts of the structure and prevent the elevator from falling if the cable should break or slacken, but the appliance failed to do its work in this instance. A convict who was on the second story of the factory when the truck caught the elevator testified that he then called down to the appellee to get out from under it, but the appellee testified that he did not hear the call.

The appellant, for the purpose of explaining the failure of the safety pawls to operate at the time of the accident, proved that immediately after the accident an iron plate on the elevator, which had held in position one of the four guide wheels intended to keep the elevator in line with the guide posts, was found to be broken. Bates a son and successor in business of the builder of the elevator, and Marshall who had charge of keeping it in repair and Williams who had charge of the machinery in the factory all testified that, in their opinion, a shock

such as the elevator would have received from being caught when descending by a truck on a floor of the factory would have been sufficient to break the iron plate and throw the elevator out of line with the guide posts and prevent the safety pawls from operating.    There was also evidence which will be hereafter noticed touching the current inspection of the elevator and its condition on the morning of the accident.

At the trial of the case the appellee as plaintiff offered four prayers all of which were granted, the first being granted in connection with the defendants prayers.    The appellant as defendant offered nine prayers all of which were either conceded or granted, except the first and second one designated A.

The plaintiff's first prayer in effect instructed the jury that the plaintiff was not guilty of contributory negligence in going underneath the elevator at the time of his injury if it was necessary for him to do so in the ordinary and usual performance of the duty of operating it, if they further found that he had been assigned to that duty as a convict in the penitentiary and was compelled to obey such assignment.    The defendant excepted specially to this prayer, because there was no legally sufficient evidence to sustain it, but we think the learned Judge below did right in granting it.    We are the better satisfied of the correctness of his action in that respect, because he granted it in connection with the defendant's prayers which instructed the jury that the plaintiff was guilty of contributory negligence if they believed that he might have operated the elevator from the outside without going under it, or that before he went under it at the time of the accident he saw that it was caught by a truck at the second floor, or that after he got under it he heard calls to him to stand from under it, and did not heed them.

The plaintiff's second prayer is the one which raises the cardinal issue in the case.    It is as follows : "The plaintiff prays the Court to instruct the jury that it was the duty of the defendant, the Baltimore Boot and Shoe Company, to use ordinary care and diligence in keeping the elevator used by it in repair, and if they shall find from the evidence that the ac-

·cident resulting in injuries to the plaintiff, Jamar, occurred by reason of a defect in said elevator which defect could have been discovered and remedied by the defendant previous to the ac-·cident by the use of ordinary care and diligence in inspecting said elevator, or if they shall find that the said accident happened by reason of an improper method of construction of ·said elevator, and shall further find that the plaintiff was in the usual, ordinary and proper discharge of his duties as the con-·ductor of said elevator when hurt, then their verdict must be for the plaintiff."   .

.  The defendant excepted specially to the granting of this ·prayer because there was no legally sufficient evidence that the accident happened either from an improper· method of construction of the elevator or from any defect in it which could have been discovered and remedied by the defendant previous to the accident.   The defendant's three rejected prayers presented the same propositions as its special exceptions, but the ·rejected prayer "A" was broader than the exceptions in as-·serting a want of evidence that the plaintiff's injuries were ·caused by any negligence of the defendant or those for whose action it was responsible.

The measure of the liability, if any, of the appellant to the appellee, must be primarily ascertained from an inquiry into the legal attitude in which the parties stood to each other at the time of the accident which forms the basis of the suit.  If the relation of master and servant, in the full and ordinary meaning of those terms, existed between the appellant and the ·convicts hired to it, their reciprocal obligations and duties would not be difficult of ascertainment for the principles gov-·erning them have been repeatedly announced by this and other Courts.   The master is bound to exercise all reasonable care having respect to the nature of the service, to provide and to ·maintain safe, sound and suitable machinery and instrumental-ities for doing the work, and also to use due diligence and care in the selection and employment of competent and careful fellow servants.   If he observes these precautions he will not be liable to the servant for injuries sustained in the course

of the employment, even though they were caused by the negligence of a fellow servant under such circumstances as would have made the master liable to a stranger if the latter had been injured. *Wonder* v. *B. & O. R. R. Co.*, 32 Md. 416; *B. & O. R. R. Co.* v. *Stricker*, 51 Md. 60; *State, use of Hamelin* v. *Malster et al.*, 57 Md. 306; *Hanrathy* v. *N. C. R. R. Co.*, 46 Md. 287; *Cumb. & Penna. R. R. Co.* v. *State, use of Moran*, 44 Md. 292; *Williams v. Clough*, 3 H. & N. 258; *Hutchison* v. *Railway Co.*, 5 Exch. 343; *N. P. R. R. Co.* v. *Herbert*, 116 U. S. 642.

The relation of master and servant rests upon a contract of service express or implied between the parties, the essential elements of which are that the master shall have control and direction not only of the employment to which the contract relates, but of all of its details, and shall have the right to employ at will and for proper cause discharge those who serve him. If these elements are wanting, the relation does not exist. *Wood, on Master and Servant*, sec. 1, 4; 2 *Bailey, on Personal Injuries relating to Master and Servant*, sec. 3139 *et seq.;* 1 *Shearman and Redfield, on Negligence*, sec. 160; *Am. & Eng. Ency. of Law*, vol. 14, p. 745 (1st ed.)

· It is obvious, therefore, that in the present case, where the employment did not rest upon a mutual contract between the appellant and the convicts whose labor it used, and the former had not control over the selection or conduct of the latter, the relation of master and servant did not exist in its strict sense or to its full extent. This Court held in *Brown* v. *The State*, 23 Md. 509, that the labor imposed upon one convicted of crime is involuntary servitude, and the same definition was applied to it by the Supreme Court of Alabama in *Buckalew* v. *Tenn. Coal. Iron & R. R. Co.*, 20 So. Rep. 606; s. c., 112 Ala. 146. In the latter case as well as in *Cunningham* v. *Bay State Shoe & Leather Co.*, 25 Hun. 211, it was distinctly held that the relation of master and servant does not exist between a contractor and the convict whose labor he employs from the State. In these cases the decision was based upon the fact that the labor of the convict is involuntary and the control over him by the contractor is limited.

On the contrary cases are not wanting in which the contractor has been held liable to the convict hired to him for injuries to the latter upon the ground either expressed or implied that the relation of master and servant did exist between them. *Chattahoochee Brick Co.* v. *Braswell*, 92 Ga. 634; *Porter* v. *Waters-Allen Co.*, 94 Tenn. 370; *Dalheim* v. *Lemon*, 45 F. R. 225.

In our opinion the legal principles applicable to such cases require that the contractor should be held to a master's liability to the convict whose labor he uses, in respect to those incidents of the employment over which he has the same measure of control that a master ordinarily has, but not as to those features of the employment over which he is essentially deprived of such control.

Applying these principles to the facts of the present case, we think, that the relation which existed between the appellant and the appellee in respect to the transactions involved in this suit was in so far analogous to that of master and servant that the appellant who had full control over the construction and maintenance of the elevator and used that structure for its own benefit, should be held liable to the appellee for any injury which he suffered by reason of the want of the exercise of reasonable care on its part in providing and maintaining the elevator in a safe and sound condition.

It was not denied by the appellee that the mechanical design and the original method of construction of the elevator itself and the timber frame in which it operated were proper, or that if the appellant had not caused them to be enclosed in sheathing they would when in good order have been reasonably safe to operate. There was, however, much testimony tending to show that the addition of the sheathing prevented the operation of the elevator from the outside and compelled the person in charge of it to incur the danger of going inside the frame and standing under the elevator in order to reach the shifting ropes for the purpose of lowering it. This testimony was stoutly contradicted and a distinct issue of fact was thus presented to be determined by the jury as to whether the con-

struction of the elevator as it stood at the time of the accident was improper.

It yet remains to be considered whether there was any legally sufficient evidence to support that portion of the plaintiff's second prayer instructing the jury to hold the defendant liable if they found that the plaintiff's injuries resulted from any defect in the elevator which might have been discovered by reasonable diligence in inspecting it previous to the accident. If the jury believed that maintaining the sheathing over the elevator and especially over the portion of it where the shifting ropes were located made its operation in that condition dangerous, that was of itself a defect that might have been discovered by the use of ordinary care and diligence in inspecting the elevator. The fact that the elevator fell upon the appellee indicated, until its fall was explained, a defective condition of the appliances intended to prevent its falling. The jury may not have believed the evidence tending to explain its fall by an encounter with a truck managed by the convict, Peacock, at the second-story floor. The only evidence that inspections of the elevator were made was that of the appellant's witness, Marshall, who testified that he had charge of the engine and boiler at the shoe factory and that he "looked after the elevator and kept it oiled," that he examined it every morning and "would look at" the safety clutches, guide wheels, and springs and oil the seats and that was all that was necessary; and on being specially interrogated as to the condition of the safety dogs on the day of the accident he said that he had examined them both before and after the accident and that "they were in good order," that "their condition was good." The witness was questioned at some length in reference to his examinations or inspections of the elevator and although he several times explained how he made them he did not state that he had at any of them made a test of the safety appliances by actually operating them to see whether they could be relied on in case of an emergency. The jury were entitled to pass upon the question whether these inspections of the elevator were made with ordinary care and diligence.

· The testimony was very conflicting upon some of the most material issues in this case, but we cannot say that there was no evidence legally sufficient to go to the jury upon the propositions embodied in the plaintiff's second prayer. We therefore are of opinion that the learned Judge below committed no error in granting the plaintiff's second prayer, especially in view of the fact that the defendant's theory of the effect of the alleged shock and injury to the elevator by reason of the convict, Peacock's, negligent handling of the truck, and also its theory of the sufficiency and effect of the inspections of the elevator made by Marshall were given to the jury by the Court in granting the defendant's sixth, seventh and eighth prayers which were drawn with admirable clearness and skill from the standpoint of the defendant.

Although the appellant also excepted to the granting of the appellee's third prayer which instructed the jury as to the measure of damages, the objection to it was not urged in the argument of the case before us, and we think that it contained a correct presentation of the law on that subject.

It follows from what we have said that the judgment appealed from must be affirmed.

*Judgment affirmed with costs.*

(Decided June 12th, 1901).