**Vincent GASSAWAY, Plaintiff,**

v.

**Mrs. Elizabeth McD. BARRY, doing business as R. C. Barry Transfer, and Infinger Transportation Company, Inc., Defendants.**

Civ. A. No. 1298.

United States District Court
W. D. North Carolina,
Asheville Division.

Sept. 2, 1954.

E. B. Whitaker, Bryson City, N. C., W. R. Francis, F. E. Alley, Jr., Waynesville, N. C., for plaintiff.

McKinley Edwards, Bryson City, N. C., Thomas A. Uzzell, Jr., Asheville, N. C., for Barry.

Williams & Williams, Asheville, N. C., for Infinger.

WARLICK, District Judge.

This is an action originally instituted in the Superior Court of Swain County in the Western District of North Carolina and thereafter removed to this court on the grounds of diversity of citizenship. It arose out of an alleged collision between a tractor and trailer, the property of Mrs. Elizabeth McD. Barry, doing business as R. C. Barry Transfer, hereafter called Barry, and a Buick automobile belonging to the plaintiff herein. The collision took place on July 4, 1950, at or around the hour of 11:30 p. m. on the main highway between Bryson City and Murphy, and about 1½ miles west from Bryson City. Subsequently four other actions were instituted in the Superior Court of Swain County each seeking a recovery against the defendants for the alleged negligence of the driver of the tractor-trailer vehicle. After the issues were joined and when the cause was to come on for hearing, counsel representing the various plaintiffs and the defendants herein entered into a stipulation—the material parts of which are to the effect that the plaintiff herein was to have and recover the sum of $2,800. It was further stipulated that J. F. Gassaway was to be awarded the sum of $2,000, Mrs. Dorothy Gassaway $500, Polly Totherow $300, and Cecil Totherow a like sum of $300, and that these amounts were to draw interest from the 22nd day of July 1954, the date of the stipulation, and that the cause was to be heard by the court without a jury, and judgment rendered as to which of the two defendants was liable for the amounts agreed upon in said stipulation. Since the amount each of the plaintiffs was to recover had been determined, the court agreed to hear the evidence as stipulated and render judgment accordingly. After hearing the evidence the following findings are made:

1. The defendant, Mrs. McD. Barry, doing business as R. C. Barry Transfer, owns and operates a considerable number of tractors and trailers engaged in interstate and intrastate business in Spartanburg, in the State of South Carolina.

2. The Infinger Transportation Company, Inc., for brevity called Infinger, is a South Carolina corporation, being wholly employed in the transportation of property in intrastate and interstate commerce and holds among other operating rights, Certificate of Public Convenience and Necessity No. M. C. 109 891, permitting and allowing it to transport asphalt and asphaltic products in bulk in tank vehicles and sheet mats over irregular routes from Charleston, South Carolina and other points to places in Georgia, North Carolina and South Carolina.

3. That in carrying out its many transportation commitments and in undertaking to care for the demands made upon its facilities, and to speed up its operation, the defendant, Infinger, entered into a lease agreement dated April 8, 1950, with defendant Barry, in which Barry leased to Infinger under the terms of a written contract, the following tractors and tankers:

|  |  |  |  |  |
|---|---|---|---|---|
| 1950 Model GMC Tractor | Motor # ~~A 427982~~ B 4A7027 | Serial # ~~47072~~ 704 | (~~Diesel~~) |
| 1949 Model GMC Tractor | Motor # 4A-910 | Serial # 874 | (Diesel) |
| 1950 Model GMC Tractor | Motor # 4A4204 | Serial # 235 | (Diesel) |
| 1950 Model GMC Tractor | Motor # A4A796 | Serial # 146 | (Diesel) |
| 1950 Model STANDARD STEEL Tanker | | Serial # 19959–3 | |
| 1950 Model STANDARD STEEL Tanker | | Serial # 19959–4 | |
| 1945 Model STANDARD STEEL Tanker | | Serial # 445721–1 | |

and immediately thereafter Barry began the hauling of asphalt products from Charleston to Murphy, North Carolina, where a road job was in course of construction.

4. The material parts of the lease for the purpose of a decision hinge entirely around sections 1, 2, and 3 of said contract. They are as follows:

"1. The lease of these trucks are to run from day to day. Subject to cancellation by either one of us on one day's notice, and the equipment hereby leased shall be used only in the transportation of asphalt from Savannah, Georgia to points and places in South Carolina and North Carolina, and from Charleston, South Carolina to points and places in North Carolina and Georgia."

"2. The truck equipment and drivers shall be under our complete direction, control and supervision *while being operated under our authority.*"

"3. All driver's wages, social security taxes, workmen's compensation, public liability, property damage and cargo insurance will be paid by us."

5. In the transportation of property under the lease, and on as many as two prior occasions, tractors leased hereunder had broken down and were thereupon taken from active service and new tractors substituted, thus making it possible for the hauling to continue and the products delivered. This was done by common consent and the insurance carrier was duly notified. This obviously could have been nothing other than a normal sort of thing to do and likely may have been entertained by both defendants in their contractual relations, for to do otherwise would have ignored all business principles if substitute tractors could be had.

6. On June 30, 1950, one of the tractors with tanker attached as listed in the lease broke down after delivering a tank car of asphalt to a job near Murphy, and a new tractor, secured from Knoxville, Tennessee was substituted. This new tractor was then attached to tanker, Serial No. 199 59–3 and was then driven by one David Barnhill to Charleston, South Carolina, for the purpose of getting another load of asphalt for a like delivery,—arriving in Charleston Sunday afternoon, July 2.

Barnhill went directly to the terminal of the Emulsified Asphalt Company and was in the loading line when D. N. Infinger, Vice President of Infinger, came up and after talking to Barnhill and learning that the tractor was new and not listed with the insurance carrier for coverage, told him to take it out of the loading line and "Don't load it until you hear from me, or until I call, or until I come back". Another of the Barry trucks was likewise taken from this loading line at that time and its driver, Netherton, similarly informed.

Up to this point in the evidence there is little, if any, disagreement as to what transpired. Thereafter the evidence is wholly in conflict.

Infinger contends from the evidence that under its policy of insurance notice had to be given to its carrier and that on two prior occasions when tractor substitutions had been made it had done so, but that it was rather inconvenient, to have substitutions made. That when an official of Barry called Infinger on Saturday afternoon, July 1, to advise that a new tractor was added in replacement that he was informed not to send for a load until Monday, as notice could not be given the insurance carrier until that time. On Sunday afternoon, July 2, when D. N. Infinger went to the Asphalt plant, as was his custom and found Barnhill and the other driver of Barry in the loading line he removed them, and immediately undertook to learn whether or not the tractor was listed on the policy of insurance,—called Mrs. Mabel Infinger, President of Infinger, had her examine the policy and on learning that this tractor was not covered, and that a representative of the insurance carrier could not be contacted, returned from his office to the Emulsified Asphalt Plant for the purpose of notifying Barnhill, the driver

of the new tractor, to remain over until the following morning when the insurance coverage could be taken care of, and then learned that the tanker had already been filled and the voyage begun. That thereafter nothing was done in furtherance of effecting the change in the tractors. Infinger contending that this trip being made by Barnhill was not under its authority as set out in the lease.

Barry contends that on the arrival of the new tractor at the asphalt plant, and after being taken from the loading line by order of D. N. Infinger, and approximately one hour thereafter, that Barnhill and the other driver of Barry, were told by a Mr. Secker in charge of the asphalt plant, "to pull up on the scales so that they could be loaded, that D. N. Infinger had called him and told him to complete the loading." Barry further contends that sometime thereafter and while the loading was still in progress that D. N. Infinger, Vice President again came to the asphalt plant and placed on the door of the left side of the tractor a cardboard containing words, "leased to Infinger Transportation Charleston, S. C., ICC No. MC 109–891", in red letters and that this was taped on said door by Infinger. That thereafter the truck left with Infinger's knowledge and consent and on July 4, after having delivered its load and while returning for another became involved in the collision herein. That the placard was on the tractor at the time of the collision and later when examined by the insurance adjusters at the jail in Bryson City.

Barry further contends that assuming Infinger's contentions to be correct, that it on learning of the departure of the tractor-trailer loaded with asphalt, failed on the following days, July 3 and 4, to have said tractor listed with the insurance carrier, and to otherwise give Barry notice that Infinger's orders had been violated. Other contentions of course are made, but the above recitations sufficiently give proper ideas as claimed from the evidence.

Taking into consideration all of the evidence and observing the demeanor of the witnesses in their testimony, I am of the opinion and as such find, as facts, that such loading was done with the permission and consent of Infinger and that the notice of the lease operation as required by the Interstate Commerce Commission was attached to the tractor by Infinger and that this equipment was being operated under Infinger's authority.

█ I am moved in my conclusion that authority to load and transport must have been expressly given, otherwise Barnhill, the truck driver would hardly have had his tanker loaded and after being told to await further orders, begun his trip, without express authority so to do. To find otherwise would violate one's knowledge of man's activities. Charleston long ago was said to be "the most beautiful and in many ways the most magnificent city in America." It has many places of entertainment for those of all ages. A young man such as Barnhill could visit the many parks and gardens, could go sailing on the Cooper and Ashley Rivers, and could visit its many beaches and bask in the sunshine, could if so inclined, observe the beauties in bathing, and otherwise entertain himself and enjoy a national holiday such as July 4, in an atmosphere of great pleasure, and any of those actions would prove much more exciting than driving a big tractor with a loaded tanker from Charleston across the mountains of North and South Carolina and to Murphy near the Tennessee border, on hot and sultry days and crowded highways. I must believe that he was given direct instructions to load and proceed.

### Conclusions of Law.

██ The sole question for decision herein is which of the defendants is liable to the plaintiff in this action and by stipulation to the other plaintiffs in the causes pending in the Superior Court of Swain County and to be decided herein. On the facts as found I conclude that Infinger Transportation Co., Inc., is liable to the plaintiff in this cause and to those otherwise stipulated, and

**674**

that no liability attaches to Mrs. Elizabeth McD. Barry, doing business as R. C. Barry Transfer. I reach this conclusion from my interpretation of the agreement entered into between the parties for the lease of the tractor and trailer, involved in this collision. It is expressly stated that "the truck equipment and drivers shall be under our complete direction, control and supervision while being operated under our authority," and the relationship between the driver of the truck and the defendant Infinger is determinable in the main from the terms of the lease agreement. This is a question of law under the applicable principles of law. It is generally held that the relationship of master and servant is created when the employer retains the right to control and direct the manner in which the details of the work are to be executed, and what the laborer shall do as the work progresses. Hayes v. Board of Trustees of Elon College, 224 N.C. 11, 29 S.E.2d 137, where the authorities are assembled. The vital test is to be found in the fact that the employer has or has not retained the right of control or supervision over the contractor or employee, as to details. Barnhill, J., in the Hayes case, supra.

In the light of these principles it is to be seen from the terms of the lease agreement that the defendant Infinger as owner of the tractor expressly assumed "complete direction, control and supervision while being operated under our authority". Moreover the defendant Infinger complied with the I.C.C. regulations by displaying on the truck *indicia* showing that it was being operated by it. Wood v. Miller, 226 N.C. 567, 39 S.E.2d 608. The doctrine of respondeat superior prevails in North Carolina and governs the relationship between master and servant, employer and employee, and consequently the person who actually operates the vehicle was, and generally is, a servant or employee of the owner of the vehicle or a third party empowered by him. It has been consistently held that where an interstate franchise carrier executes a lease or contract by which its equipment is augmented and used as one of its fleet of trucks under its franchise and with evidences of its operation attached, the holder of the franchise is responsible for the operation of the truck in so far as third parties are concerned. Brown v. Bottoms Truck Lines, 227 N.C. 299, 42 S.E.2d 71; Newsome v. Surratt, 237 N.C. 297, 74 S.E.2d 732, where the authorities are cited. Hodges v. Johnson, D.C., 52 F.Supp. 488; War Emergency Co-op Ass'n v. Widenhouse, 4 Cir., 169 F.2d 403.

Counsel will submit decree.