## GALLAGHER'S ESTATE ET AL. v. BATTLE

### [No. 136, October Term, 1955.]

594

*Decided April 11, 1956.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS and HENDERSON, JJ.

*Paul F. Due,* with whom were *James C. L. Anderson*
and *Samuel E. Proctor, Jr.,* on the brief, for the appel-
lants.

*Max R. Israelson,* with whom were *John W. Hessian,
Jr.,* and *Joseph S. Kaufman* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment entered on the ver-
dict of a jury in favor of the plaintiff, appellee, William
Battle, for injuries received in an automobile collision.

Previous to the date of the injury herein, the Budd
Company in Philadelphia ordered steel from the Bethle-
hem Steel Company in Sparrows Point, Maryland. The
Estate of Edward A. Gallagher, Lottie Gallagher, Trus-
tee, Arthur A. Gallagher, Individually and trading as E.
A. Gallagher & Sons, hereinafter designated as Gallagh-
er, appellant, was a common carrier of freight by truck
authorized to operate under a certificate of public con-
venience and necessity issued by the Interstate Commerce
Commission (I. C. C.) In this capacity it was engaged
in hauling steel from Sparrows Point to the Budd Com-
pany in Philadelphia. Because Gallagher did not have
sufficient equipment to haul the order, it leased a large
tractor trailer unit by what is termed as a "trip lease".
The tractor was owned by David Taylor and the trailer
by Harry F. Steger. Neither Taylor nor Steger had a
certificate of public convenience and necessity from the
I. C. C. For six months prior to the accident in this
case, which occurred about 1:30 A. M. on January 22,

1953, Steger had been driving the leased tractor trailer unit making many trips in hauling steel for Gallagher from the Bethlehem Steel Company to the Budd Company.

On the morning of January 21, 1953, in pursuance of a lease executed on January 20th, Steger proceeded to the Bethlehem Steel Company and obtained a load of steel. After resting he proceeded toward Philadelphia about 4 P. M. In the trial of the case, when asked whether on other occasions between Sparrows Point and Philadelphia he would telephone Gallagher to find out whether Gallagher wanted him to haul another load, Steger answered "Yes", and said that, as he had done on other trips for Gallagher from Sparrows Point to Philadelphia, he stopped at a diner near Wilmington, Delaware, and called Gallagher's dispatcher to see whether Gallagher wanted to engage him to haul another load. Steger said that, in reply to his inquiry, Gallagher's dispatcher "said as soon as I could load at Budd Company I'd come back and pick up another load." This conversation is denied by Gallagher but for the purposes of this case we must assume that it occurred. Steger then proceeded to Philadelphia and delivered his load of steel to Budd. As soon as he got something to eat he started back toward Baltimore. On his way back, on January 22, 1953, while cleaning the windshield of the tractor with a newspaper, and while the tractor trailer was in motion under the Pennsylvania Railroad underpass at Naaman's, Delaware, at about 1:30 A. M., he collided with the automobile driven by the plaintiff, appellee, William Battle. As a result, Battle was injured. In the trial below the appellee recovered a judgment against Taylor, Steger, and Gallagher. From that judgment all of the defendants appealed to this Court.

Prior to the hearing in this Court, Taylor and Steger dismissed their appeal. Therefore, Gallagher is left as the sole appellant here. No issue is here made as to Steger's negligence in the operation of the tractor trailer. The sole question is Gallagher's responsibility for Steger's negligence. As plaintiff gave no notice to the

defendants of his intention to rely on Delaware law, the case was decided under the law of Maryland. *The Maccabees v. Lipps,* 182 Md. 190, 196, 34 A. 2d 424; *Wilson v. Dailey,* 191 Md. 472, 476, 62 A. 2d 284.

As on all previous trips when Steger was hauling for Gallagher, on this particular trip a trip lease was entered into on January 20, 1953, between Taylor and Gallagher, wherein Taylor as lessor, by Steger, leased to Gallagher as lessee the tractor and trailer above mentioned. The lease contained a number of provisions, among which were the following. "The term of lease shall be the duration of one single trip from Sparrows Pt., Md. to Phila., Pa." The equipment should be under the complete control of the lessee for the limited purpose of safety to the public and safe delivery of the shipment. The lessor agreed to fully maintain the equipment in good condition and to comply with all safety requirements of the I. C. C. The lessee should not be liable for any damage or depreciation to the motor vehicle while in its possession under the lease. The lessor agreed to be fully responsible to the lessee for any and all negligence of himself and the operator of the equipment. The lessor further agreed to supply the services of a competent driver, to pay Social Security and other benefits to all employees handling the equipment, to indemnify and save harmless lessee against any loss or damage resulting from the negligence and incompetence of all employees handling the equipment. Lessor also agreed "to indemnify and save harmless the Lessee against any loss resulting from claims brought against Lessee for any property damage or bodily injury, or both, sustained by anyone while the leased equipment is under any control of the Lessee." It was agreed that the lease terminated when "(a) a trailer owned by the Lessor is unloaded at the above described destination (b) a trailer not owned by the Lessor is detached at the above described destination. Lessor certifies that the operator of leased vehicle was examined by a physician on or about ............... as required by the I. C. C. and agrees to furnish copy of said physician's examination

certificate. The Lessee assigns and affixes to said vehicles for the duration of this lease its Interstate Commerce Commission identification placards which must be removed at the aforementioned destination and returned to the Lessee before full payment of the rental sum is made. Lessor shall carry public liability insurance in the minimum amount of $5,000.00 for injury to one person and in the minimum amount of $10,000.00 for injury to more than one person arising out of any one accident and property damage insurance in the minimum amount of $5,000.00 covering injury or damage to the property of other persons. Lessor shall furnish Lessee with certificate of insurance evidencing the existence of such policies. Any alteration hereof either in the names of parties or the other provisions, shall annul, cancel and invalidate this lease insofar as any further obligations thereunder of E. A. Gallagher & Sons, as Lessee, are concerned."

On each trip to Philadelphia, including that made on January 21, 1953, there were placed on the tractor doors placards which stated "Operated by E. A. Gallagher & Sons, I. C. C. MC 77569." The testimony was disputed as to whether these placards were on the tractor at the time of the accident. However, Steger admitted that he was instructed by Gallagher to remove the placards after he delivered the steel to the Budd Company, and the lease so provides.

The primary question before us in this case is whether there was legally sufficient evidence to submit to the jury the question of Gallagher's liability for Steger's negligence on the return trip from Philadelphia.

It is stated in *Restatement of the Law of Torts, Negligence,* Section 428: "An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for bodily harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity." There is no doubt that, if

the accident had occurred on the trip from Sparrows Point to Philadelphia, for which trip the tractor trailer was leased and on which the I. C. C. placards were placed by Gallagher, Gallagher would have been liable for Steger's negligence in spite of the fact that Taylor agreed to save Gallagher harmless against bodily injury to other persons. *H. E. Wolfe Construction Co. v. Fersner,* (C. C. A. 4th), 58 F. 2d 27; *Western Express Co. v. Smeltzer,* 88 F. 2d 94; *Venuto v. Robinson,* 118 F. 2d 679; *War Emergency Co-op. Assn. v. Widenhouse,* (C. C. A. 4th), 169 F. 2d 403; *Kemp v. Creston Transfer Co.,* 70 F. Supp. 521; *Gassaway v. Barry,* 123 F. Supp. 670; *Brown v. Bottoms Truck Lines,* 227 N. C. 299, 42 S. E. 2d 71; *Newsome v. Surratt,* 237 N. C. 297, 74 S. E. 2d 732; *Brabham v. Southern Asphalt Haulers, Inc.,* 223 S. C. 421, 76 S. E. 2d 301; *Eli v. Murphy,* 39 Cal. 2d 598, 248 P. 2d 756; *Lehman v. Robertson Truck-A-Way,* 122 Cal. App. 82, 264 P. 2d 653; *Trautman v. Higbie,* 10 N. J. 239, 89 A. 2d 649; Annotation, 17 A. L. R. 2d 1396; *Regal Laundry Co. v. Abell Co.,* 163 Md. 525, 163 A. 845; *Maryland Casualty Co. v. Sause,* 190 Md. 135, 57 A. 2d 801, and cases there cited; *Wood v. H. W. Gossard Co.,* 204 Md. 177, 103 A. 2d 130.

In *Hodges v. Johnson,* 52 F. Supp. 488, heavily relied on by the appellee, Jocie had a certificate from the I. C. C. permitting him to haul general commodities in interstate commerce. Johnson, who was engaged in the trucking business, had no such certificate. Jocie entered into a lease agreement whereby Jocie would lease the truck to Johnson who would haul in interstate commerce in the name of Jocie and under Jocie's certificate and license from the I. C. C. All freight was hauled on standard bills of lading in the name of Jocie who paid certain taxes, insurance premiums, and other expenses. Johnson received eighty percent of the freight charges and Jocie twenty percent. Under this arrangement Johnson's truck proceeded from Charlotte, North Carolina, to Roanoke, Virginia, delivered the load and was returning empty to Charlotte with a bill of lading made out and signed in the

name of Jocie by an employee of Johnson when the accident occurred. Jocie sometimes obtained a return load of freight for Johnson's truck and such return freight was handled the same way. Johnson never hauled return loads of interstate freight for himself but always for and in the name of Jocie. Jocie was held liable for the accident. Under the more or less partnership arrangement between Johnson and Jocie it is clear in that case that the lease between Jocie and Johnson covered both the trip from Charlotte to Roanoke and return.

Steger, at the time he testified that he called Gallagher's dispatcher on the way to Philadelphia and was told to return and pick up another load, had been called by plaintiff's counsel as an adverse witness, subject to cross-examination, under the provisions of Code, 1951, Article 35, Section 8. The appellant objects to the introduction of this testimony and claims that Steger was an adverse party to the plaintiff only in a strictly technical sense, but actually so far as the issue of Steger's relationship to Gallagher was concerned, the plaintiff and co-defendant, Steger, were on the same side of the case. For the purposes of this opinion, we will assume without deciding, that the trial court was correct in overruling Gallagher's objection to that part of Steger's testimony.

The appellee contends that there was sufficient evidence for the jury to find that Gallagher was responsible for Steger's negligence under the doctrine of *respondeat superior*. In the case of *Henkelmann v. Insurance Co.*, 180 Md. 591, 26 A. 2d 418, Judge Delaplaine discussed this doctrine and what was there said appears pertinent to the question before us here. We quote at length from that opinion. "This doctrine [*respondeat superior*] was founded on the principle that 'every man, in the management of his own affairs, whether by himself or by his agents or servants, shall so conduct them as not to injure another; and if he does not, and another thereby sustains damage, he shall answer for it.' *Farwell v. Boston & Worcester R. R. Corp.*, 4 Metc., Mass., 49, 55, 38 *Am. Dec.* 339, 340. The courts, however, have regarded the

doctrine with jealousy and have confined it within limits as narrow as are consistent with the true interests of society. *Wood, Master and Servant,* 2d Ed., Sec. 277. In 1840 the courts in England began to relax the doctrine by holding that it does not apply to independent contractors. In 1869 the Court of Appeals of Maryland, in an opinion by Judge Alvey, observed that the doctrine had been modified by the English decisions, and held that it is not applicable where the employee is 'a contractor, pursuing an independent employment, and, by the terms of the contract, is free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about the work, exclusive of the control and direction, in this respect, of the party for whom the work is being done.' *Deford v. State, to use of Keyser,* 30 Md. 179, 203. In 1884 the Court of Appeals said that the theory upon which liability under the doctrine is predicated is that the master is constructively present, so that the negligence of the servant is the negligence of the master. *Adams v. Cost,* 62 Md. 264, 267, 50 *Am. Rep.* 211. In 1901 this court stated that an essential element of the relation of master and servant is that the master shall have control of the employment and all of its details. *Baltimore Boot & Shoe Mfg. Co. v. Jamar,* 93 Md. 404, 413, 49 A. 847, 850, 86 *Am. St. Rep.* 428. Finally in 1932 we definitely decided that the test in determining whether a person is a servant or an independent contractor is whether the employer has the right of control over the employee in respect to the work to be performed. *State, to use of Boznango v. Blumenthal-Kahn Electric Co.,* 162 Md. 84, 92, 159 A. 106. Thus, it was held by this court that a salesman who sold goods on commission, operated his own car at his own expense and received no directions as to his work or route, was an independent contractor, so that his employer was not liable for injuries caused by him in the operation of his car. *Washington News Co. v. Satti,* 169 Md. 489, 182 A. 286. In recent years, on account of the extensive use of the motor vehicle with its accompanying dangers, the

courts have realized that a strict application of the doctrine of *respondeat superior* in the modern commercial world would result in great injustice. * * * It is now held by the great weight of authority that a master will not be held responsible for negligent operation of a servant's automobile, even though engaged at the time in furthering the master's business unless the master expressly or impliedly consents to the use of the automobile, and *had the right to control the servant in its operation, or else the use of the automobile was of such vital importance in furthering the master's business that his control over it might reasonably be inferred. Khoury v. Edison Electric Illuminating Co.*, 265 Mass. 236, 164 N. E. 77, 60 A. L. R. 1159; *Aldrich v. Tyler Grocery Co.*, 206 Ala. 138, 89 So. 289, 17 A. L. R. 617; *Dohner v. Winfield Wholesale Grocery Co.*, 116 Kan. 237, 226 P. 767; *Gall v. Detroit Journal Co.*, 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164; *Harrington v. H. D. Lee Mercantile Co.*, 97 Mont. 40, 33 P. 2d 553; *James v. Tobin-Sutton Co.*, 182 Wis. 36, 195 N. W. 848, 29 A. L. R. 457; *Kassela v. Hoseth,* 217 Wis. 115, 258 N. W. 340; *Stockwell v. Morris,* 46 Wyo. 1, 22 P. 189; 5 *Am. Jur., Automobiles,* Sec. 393; 5 *Blashfield, Cyclopedia of Automobile Law and Practice,* Sec. 3079. * * * In other words, a principal employing an agent to accomplish a result, but not having the right to control the details of his movements, is not responsible for incidental negligence while such agent is conducting the authorized transaction. 1 *Restatement of Agency,* Sec. 250.

"Of course, even an agent may be subject to the control of his principal in respect to some portion of the work to be performed, and under such circumstances the doctrine of *respondeat superior* can be invoked. *But it has been distinctly held that the doctrine applies in such a case only when the relationship of master and servant existed in respect to the very thing from which the injury arose. Leachman v. Belknap Hardware & Mfg. Co.,* 260 Ky. 123, 84 S. W. 2d 46." (Italics supplied here). See also *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 119 A. 2d 423.

The manager of Gallagher in Baltimore testified that he did not recall having any conversation with Steger about the lease of January 20, 1953. He always told the truck drivers when to load the steel at the mill. Steger and other drivers were constantly instructed as to the provisions of the lease and how to keep their logs, and to remove the I. C. C. placards after the load was delivered. If Steger did not abide by the I. C. C. regulations Gallagher might not give Taylor another lease. These instructions would not negative the fact that the tractor and trailer were operated by an independent contractor. Steger was paid by Taylor, not by Gallagher. Steger testified without contradiction that he was not told by Gallagher the route by which he should transport the steel. He said: "You can use Route 1, Route 40, or whichever route you want to use. They never told you what route to use as long as you got the steel up there." He further said that when he was instructed to pick up a load at a certain time, he was told to deliver the load as fast as he could, within reason and safety. He was not told to deliver the load by a certain time. There was no evidence that Gallagher had the power to control and direct Steger in the rendering of his services. The general manager of Gallagher in Philadelphia testified in reference to the trip leases: "It makes it easier for us to engage the services of these independent owner-operators because we have a job of work that takes it from Point A to Point B, and due to the sporadic nature at times within certain hours of the day, we have no further use for them, and it permits them to then engage themselves to other carriers for a possible return load or a possible trip to another point distant from Point B, let's say the destination in our particular case, so, therefore, they are free to act for themselves, and that is what I mean when I say it makes it fluid as far as they are concerned. They have a freedom of action which, if we had another arrangement, they wouldn't be so free to engage themselves to other carriers." There is no evidence to the contrary. Steger said he felt free to haul for anyone he wanted.

Even after Steger had been told to return to Sparrows Point for another load, there was no obligation on him to do so. Gallagher had no such control over Steger to so compel him. It merely offered Steger another contract. When his trailer was unloaded at the Budd Company, Steger could have picked up another load in Philadelphia and taken it to any destination he chose. If he had done so, Gallagher would have had no right of action against him or Taylor. We are of opinion that there was no evidence to support the doctrine of *respondeat superior* in the instant case.

The appellee further contends that there was legally sufficient evidence from which the jury could find that the original trip lease was modified by the telephone conversation asking Steger to return for another load. Of course, where a contract is in writing, parol evidence is not admissible to add to, detract from, or vary the terms of the agreement. However, the parties may, subsequent to entering into the contract, rescind it by mutual consent, enter into a new contract, or modify the existing one. *Furness, Withy & Co. v. Randall,* 124 Md. 101, 91 A. 797. As said by *Professor Williston* in his work on *Contracts,* Vol. 3, Sec. 623, pg. 1792: "The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only the acts but the declarations of the parties may be considered." It was said in *Saul v. McIntyre,* 190 Md. 31, 36, 57 A. 2d 272: "* * * an oral lease may be construed or modified by conduct, especially if it is subsequently recognized in writing under seal." There is no evidence here that by the telephone call the parties intended the lease to cover the return trip. Their actions show the contrary. The evidence shows that the call on January 21st was not the first time that Steger had been requested to carry another load. It had been done on other trips. There were separate leases for each trip. If, after those other trips, a telephone call was intended to make the lease cover the return trip, the future leases

would have so provided. The parties did not so provide in the lease of January 20th.

As to the I. C. C. placards on the truck at the time of the accident, Steger admitted that he was instructed by Gallagher to remove these placards after delivering the load of steel to the Budd Company. The fact that they were not removed was in no way the fault of Gallagher. The accident occurred at night and, therefore, the placards were not seen by the appellee and they in no way influenced the operation of appellee's motor vehicle or were in any way responsible for Steger's negligence and the consequent injury to the appellee.

In *Simon v. McCullough Transfer Co.,* 155 Ohio State 104, 98 N. E. 2d 19, Bolton, who had no Public Utility Commission or I. C. C. permit, was engaged by McCullough Transfer Company, which had such permits, to haul coal whenever it was available from Grove City, Pennsylvania, to the Youngstown Sheet and Tube Company in Struthers, Ohio. McCullough's permits were on Bolton's truck at the time of the accident. Defendant McCullough hired many other truckers under the same arrangements. Bolton had hauled coal for defendant for approximately a year before the date of the accident, although not restricted to haul only for the defendant. He chose his own route for making his trips and was not required to return to defendant's office or to the coal mine after he had picked up a shipment. All expenses of the truck, including costs of gasoline and oil, were paid by Bolton, and he was paid $1.20 per ton for the coal he hauled. On the day of the accident Bolton had delivered his last load to the Youngstown Company at about 5:30 P. M. By that time the coal mine was closed down and his work for that day was finished as far as the defendant was concerned. Bolton then proceeded with his empty truck to a beer garden and approximately two hours later was involved in the accident, which occurred between two and three miles from where he had delivered the coal. The Supreme Court of Ohio in that case held that at the time of the accident Bolton was an independent

contractor, in no sense under McCullough's guidance or control and that McCullough was not liable.

In *Costello v. Smith*, (U. S. Ct. of App., 2d Cir., January 19, 1950), 179 F. 2d 715, 16 A. L. R. 2d 954, Johnson Motor Lines, Inc., (Johnson), was the carrier with the I. C. C. permit. Johnson executed a one-trip lease with a truck owner named Withers. Withers employed Smith to drive the truck. Withers had no liability insurance. Smith drove Withers' tractor and trailer transporting freight from Charlotte, North Carolina, to Providence, Rhode Island. The freight had been delivered and the I. C. C. tags had been returned to Johnson's terminal in Providence. Smith was driving the tractor trailer back when he had the accident. In holding Johnson not liable, it was said in that case: "Johnson was under no obligation to furnish a return load of freight and it was not customary for Johnson to do so. Withers had previously leased his equipment to Johnson for other trips, as well as to other carriers. It is conceded that if the collision had happened on the out-bound trip to Providence, Johnson as lessee of the truck would have been liable for the truck driver's negligence. A number of cases have so held. This is on the principle that one who can lawfully operate only under a public franchise cannot escape liability by engaging an independent contractor to carry on the activity for him. *Restatement, Torts,* Section 428. It is an exception to the independent contractor rule. However, that principle does not reach the present case. Here the independent contractor, Withers, had performed his contract with Johnson, the truck had been redelivered to Withers' agent Smith, and in returning to Charlotte, N. C., Smith was engaged on Withers' business, not on Johnson's. On general principles of agency Smith's negligence cannot be imputed to Johnson. The appellant argues that the exception to the rule of non-liability for the torts of an independent contractor should cover the return trip of the truck no less than the outbound trip. The argument, if we understand it, relies both on the federal statute and the local law of Connecticut. As to

the former, it is urged that to permit Johnson to escape liability will subvert the policy of the Act in so far as it seeks to provide for protection of the public. See Sections 304(a) (3), 315. Such appears to have been the view of Judge Barksdale in *Hodges v. Johnson,* D. C. Va., 52 F. Supp. 488. With due respect we are constrained to disagree. So far as concerns the safety of the public, determination of what regulation is required rests with the Commission; the legislative grant is not to the courts. So long as the properly constituted authority is content not to regulate further than it has the operation of empty trucks after the termination of a 'one-way lease,' the courts may not properly by judicial decision supplement the Commission's regulations. The Act itself does not prescribe conduct for Withers. He was not a 'common carrier by motor vehicle' as defined in Section 303(a) (14) of the Act; hence he needed no certificate under Section 306. Nor was he a 'contract carrier' as defined in Section 303(a) (15) requiring a permit under Section 309. This is conceded in the supplemental briefs of the parties and the brief of the Commission as *amicus curiae.* Whether he was a 'private carrier of property by motor vehicle' as defined in Section 303(a) (17) we need not say. The Commission's brief states that 'Private carriers are subject to the Act only with respect to safety of operations, hours of service of employees and standards of equipment, as indicated in Section 204(a) (3)'; and in none of these respects was Withers shown to have been in default. Nor do the present regulations forbid a common carrier such as Johnson from making a one-way lease with an independent contractor such as Withers. In the absence of statutory command or of regulatory action by the Commission, we cannot say that a one-way lease is so far contrary to the policy of the Act that a court should impose liability on the lessee after the lease has ended. Nor has any Connecticut decision been brought to our attention which would require or permit the imposition of such a liability under the local law. The appellant urges that in the absence of specific local

authority we should rely upon section 427 of the Restatement of Torts as evidence of the law of Connecticut. The principle there stated is that 'one who employs an independent contractor to do work which is inherently dangerous to others is subject to liability for bodily harm caused to them by the contractor's failure to exercise reasonable care to prevent harm resulting from the dangerous character of the work.' It may well be doubted whether a trailer-truck is an intrinsically dangerous instrumentality to be classed with ferocious animals or high explosives in applying the above-quoted principle. See *Greeley v. Cunningham*, 116 Conn. 515, 165 A. 678; *Restatement, Torts*, Section 427, Comment (a). But in any event, the principle assumes that the person held liable 'employs' an independent contractor to do dangerous work. Johnson's employment of Withers ended with discharge of the cargo of the truck at Providence. While it was probable that Smith would drive the truck back to Charlotte, N. C., it was immaterial to Johnson whether or not he did so. It was no part of the venture for which Johnson had employed the independent contractor that the truck should return empty. As soon as the load was discharged at Providence, Smith was at liberty to obtain another load to transport in any direction for another carrier authorized under the Act."

In *Marriot v. National Mutual Casualty Co.*, 195 F. 2d 462, the lease was for no definite period. However, it stated that it was not to be for less than ten days. The accident occurred on the return trip from a hauling operation where the driver expected to pick up a return load for lessee. The Court there properly held on appeal that both the lessee and lessor were liable. The Court distinguished that case from *Costello v. Smith, supra,* on the ground that there, as in the instant case, the lease was specific and provided that it was for a one-way trip and, therefore, the lessor was relieved of any responsibility when the truck reached its destination.

As pointed out in *Costello v. Smith, supra,* the constituted authority for regulating the operation of common

carriers in interstate commerce is the I. C. C. At the time this accident occurred the Commission was content not to regulate the operation of employee trucks after the termination of the one-way lease. The courts should not by judicial decision supplement the Commission's regulations.

The I. C. C., probably realizing that the return of trucks should be controlled, effective September 1, 1953, after the accident in this case, adopted a new regulation in regard to leasing of vehicles, one of the provisions of which was to make the minimum leasing period thirty days. 49 Code of Federal Regulations, page 115 (pocket supplement), Section 207.4 (3). This section making a thirty day lease mandatory was drafted in compliance with the report of the I. C. C. in Ex Parte No. MC-43 in 52 Motor Carriers Cases 675.

In the case of *American Trucking Ass'ns v. United States,* 344 U. S. 298, 73 Sup. Ct. 307, 97 L. Ed. 337, decided January 12, 1953, before the effective date of the thirty day minimum regulation, the Supreme Court, in holding that this new regulation abolishing one trip leases was in the authority of the I. C. C.; that it did not violate public policy; that it was not unreasonable; and that there was no confiscation in enforcing this rule, said: "Thus the practice of using leased equipment and that obtained by interchange is brought into conformity with the regulation of carrier-owned equipment to avoid evils that had grown up in that practice." It is the responsibility of the I. C. C. that this rule was not made effective sooner, and not the responsibility of the courts.

The instant case is remarkably similar to *Simon v. McCullough Transfer Co., supra,* and *Costello v. Smith, supra.* It differs from *Costello v. Smith* in that Gallagher wished Steger to return to Sparrows Point. As above stated there was no requirement on the part of Steger to return to Sparrows Point. If he wished to carry another load of steel to the Budd Company he could do so and obtain another lease. As in *Costello v. Smith, supra,* it was not part of the venture for which Gallagher had

contracted with the independent contractor that the trailer should return empty. As in that case, the Taylor and Steger equipment here was not in default in any of the requirements of the I. C. C. As in that case, in the absence of statutory command or of regulatory action by the Commission, the courts cannot say that a one-way lease is so far contrary to the policy of the Act that we should impose liability on the lessee after the lease had ended. The I. C. C. did not see fit to outlaw these one trip leases until after the accident in this case.

We are of opinion that there was not legally sufficient evidence to submit to the jury the question of Gallagher's liability for Steger's negligence and, therefore, that the judgment against Gallagher should be reversed.

*Judgment reversed, with costs, without a new trial.*