780 A.2d 303

BALTIMORE HARBOR CHARTERS, LTD.,

v.

Frank Joseph AYD, III.

No. 114, Sept. Term, 2000.

Court of Appeals of Maryland.

Sept. 12, 2001.

Reconsideration Denied Oct. 10, 2001.

369

C. William Michaels, Baltimore, for petitioner.

Steven D. Shemenski (Turnbull, Mix & Farmer, on brief), Towson, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

BATTAGLIA, Judge.

Petitioner Baltimore Harbor Charters, Ltd. challenges the decision of the Court of Special Appeals, *Baltimore Harbor Charters v. Ayd*, 134 Md.App. 188, 759 A.2d 1091 (2000), which ordered a new trial on the issue of whether BHC violated the Maryland Wage Payment and Collection Law, Maryland Code, § 3–501, et seq. of the Labor and Employment Article (1991, 1999 Repl.Vol.), with regard to a former employee and former

shareholder of BHC, respondent Frank Joseph Ayd, III (hereinafter "Ayd").

## I. Facts

In 1983, Ayd, who had a long-standing interest in boating and mechanics, purchased *Summer Flight*, a fifty-three foot Pacemaker boat. After a five year period of repair and restoration, *Summer Flight* finally received certification by the United States Coast Guard, permitting it to be used in a charter boat business in the Baltimore and Annapolis area. In 1989, Ayd and a friend, Suzanne Edwards, formed Baltimore Harbor Charters, Ltd. ("BHC"), to which Ayd's new wife, Carol, acceded as a shareholder and board member in 1991. In the same year, pursuant to an informal action of the Board of Directors of BHC, Ayd was "employed to perform management and consulting services on a part-time basis for the Corporation in consideration of the sum of $200.00 per month, payable monthly until terminated by him or the Corporation on ninety (90) days notice."

By 1993, the Ayds began divorce proceedings, precipitating an effort to sell their respective interests in BHC. Additionally, Edwards had resolved to leave BHC. During the same period, Robert Berman, a high school friend of both Ayd and his brother, was attempting to explore new investment opportunities. He purchased all of the outstanding shares of common stock of BHC from Ayd, Carol Ayd, and Suzanne Edwards for approximately $3,500. The purchase of the common stock of BHC, however, did not include use of Ayd's boat, *Summer Flight*, in the charter boat business.

In the Spring of 1994, Berman purchased a seventy-five foot yacht, *The Wrecking Crew*, for $365,000 from a boat dealer in Fort Lauderdale, Florida, to be used in BHC. Ayd organized and performed substantial improvements to *The Wrecking Crew*, later renamed *The Royal Blue*, in order to bring the vessel within the appropriate standards for Coast Guard certification and prepare it for use in the charter business.

After the purchase of the stock of BHC, Berman became Vice President of BHC, named Ayd as President and Treasurer of the company, and made Rita O'Brennan, Ayd's sister, the Corporate Secretary. Throughout the transition of ownership of BHC, Ayd continued to perform the same managerial and consulting functions he had performed for BHC since the time of the company's formation in 1989. From the winter of 1994 until August of 1996, Ayd was the sole signatory on BHC's checking account. Berman, however, believed that during this time period he was also an authorized user of the account.

Both BHC and Ayd agreed that from the time Berman purchased BHC in February 1994 to the day Ayd resigned from the corporation, Ayd was entitled to compensation in the amount of a $200 captain's fee per charter and a $200 per month administrative fee.[1] Ayd, however, asserted that pursuant to an "Informal Action of the Board of Directors of Baltimore Harbor Charters, Ltd.," which was memorialized on February 25, 1994, he was to be paid the sum of $576.92 per week for management, consulting and other services, as well as for performing his functions as President and Treasurer of BHC.[2] The original executed document, which was to be

---

1. In July 1992, Ayd, his wife, and Edwards signed a document entitled "Informal Action of the Board of Directors of Baltimore Harbor Charters, Ltd.," which provided in relevant part as follows:

 "Further Resolved: that Frank J. Ayd, III is hereby employed to perform management and consulting service on a part-time basis for the Corporation in consideration of the sum of $200.00 per month, payable monthly until terminated by him or the Corporation on ninety (90) days notice."

 This agreement referring to the $200.00 per month administrative fee to be paid to Ayd for his "management and consulting services" remained in effect at the time Berman purchased BHC. The parties also had an oral agreement, which is not in dispute, concerning Ayd's entitlement to a fee of $200.00 per charter trip that he captained.

2. The informal action of February 25, 1994, signed by Berman, Ayd, and O'Brennan declared:

 "The undersigned, constituting the members of the Board of Directors of Baltimore Harbor Charters, Ltd., (BHC), a Maryland Corporation, in accordance with Section 2–408(c) of the Corporations and Associations Article of the Annotated Code of Maryland, do hereby take the actions below set forth, and to evidence their waiver

placed in the minute book of the corporation following its execution, was not located at the time of trial in this matter. Berman maintained that the informal action of the board on February 25, 1994 never took place. A copy of the executed document was produced by Rita O'Brennan pursuant to a BHC subpoena in November of 1997.[3]

Under the terms of the informal board action of February 25, 1994, Ayd did, in fact, receive six payments of the $576.92 salary for his services in the winter of 1994. BHC, however, did not have an adequate cash flow thereafter, which resulted in Ayd being paid only sporadically for his administrative services and captain's fees and not receiving any further payments of the $576.92 weekly salary.

In March of 1994, Ayd's boat, *Summer Flight,* which also served as his residence, had to go into drydock for repairs. Berman gave Ayd permission to stay onboard *The Royal Blue,* because Ayd was without funds and needed a place to live. Pursuant to this oral arrangement, Ayd designed and built small living quarters onboard *The Royal Blue.* Berman never objected to the modifications made by Ayd to *The Royal Blue,* nor did he ask Ayd for payment for living on the boat. At trial, however, Berman asserted that Ayd's residence on *The Royal Blue* served as a form of compensation for his services.

BHC continued to experience financial difficulties throughout 1995 and 1996. In August of 1996, Ayd received a letter from Berman explaining that Berman would be taking over

---

of any right to dissent from such actions, do hereby consent as follows:

RESOLVED: that Frank J. Ayd, III is hereby employed by BHC to perform management, consulting, and such other services as the Board of Directors may direct, and to serve as President of BHC, in consideration of the sum of $576.92 per week, payable weekly until terminated by him or the Corporation on ninety (90) days notice.

The above resolution constitutes the Informal Action of the Board of Directors of Baltimore Harbor Charters, Ltd., as of the 25th day of February, 1994."

3. In addition to the various agreements concerning Ayd's salary, the parties also had an oral agreement by which Berman sublet a boat slip at Tindeco Wharf from Ayd for $430.00 per month for *The Royal Blue.*

the financial operation of BHC. Berman stated that he began asking Ayd for the company's books in the Spring of 1996, but perceived that Ayd was stalling him by not turning them over. Ayd asserted that prior to receiving the August 1996 letter, he received no indication that Berman was displeased with his work for the company. In late August of 1996, Berman closed the existing bank accounts for BHC and opened a new account without Ayd as a signatory.

After futile attempts to resolve their differences, Ayd sent a letter to Berman on August 26, 1996, indicating that if the two could not arrive at a mutual agreement by September 9, 1996 at 9:00 pm regarding the future of Ayd's position in the company, then Ayd would resign from BHC. The parties had one meeting to discuss Ayd's continued employment with BHC, with the issue of Ayd's salary being a point of contention. The parties failed to reach an agreement, and Ayd terminated his employment with BHC, as promised, on September 9, 1996. When he left BHC, Ayd took with him his personal effects, tools and other belongings which he had brought onto *The Royal Blue* from his boat, *Summer Flight*, as well as materials he had installed onto *The Royal Blue* from *Summer Flight* so that *The Royal Blue* could use the boating slip Ayd rented for *Summer Flight*.

On July 9, 1997, Ayd sued BHC in the Circuit Court for Baltimore City, alleging breach of contract, *quantum meruit*, unjust enrichment, and a claim for unpaid wages in violation of the Maryland Wage Payment and Collection Act, (the "Wage Act"), Md.Code, Lab. & Emp. § 3–501 et seq. (1991, 1999 Repl.Vol.). The complaint alleged that Ayd had only been paid a total of $9,861.55 in salary and administrative fees during the period of February 1994 to September 9, 1996. He alleged that he was entitled to payment of the $576.92 weekly salary as specified in the informal action of the board, as well as unpaid tip fees of $40.00 (twenty percent of the crew fee) per charter trip that he captained. Ayd sought a total of $81,187.28 in unpaid wages under his breach of contract claim, treble damages totaling $243,561.84 under the Wage Act, and $300,000 on his claims of unjust enrichment and *quantum*

*meruit.* BHC filed a counterclaim against Ayd alleging breach of a fiduciary duty, conversion, and trespass to chattels.

On January 13, 1999, a four-day jury trial began. At the close of Ayd's case-in-chief, both Ayd and BHC presented motions for judgment pursuant to Md. Rule 2–519 (1999), which were denied, with the exception of BHC's motion regarding Ayd's claims under the Wage Act. The trial court reserved decision on the Wage Act claim. Prior to instructing the jury, the trial judge ruled on the reserved issue and dismissed Ayd's claim under the Wage Act, stating as follows:

Alright [sic]. The Court is going to dismiss the Count. It's in the Court's view that the statute was not designed to cover the situation as outlined in the Plaintiff's case. The statute contemplates (1) a regular pay period, (2) where an employee is generally paid bi-weekly, and (3) in check or currency. In a light most favorable to the Plaintiff, the facts in this case show, that there was no regular pay periods. The Defendant controlled the, excuse me. The Plaintiff controlled the Defendant's accounts up to and including the date, in 1996, when the Defendant took over the books. He had the, he being the Plaintiff, had the control to write payroll checks himself and to pay himself whenever the cash was available. His testimony is that he voluntarily deferred during the time that he worked with Baltimore Harbor Charters, did not take any commissions or tips which may have been due him, voluntarily. The only thing of value that was consistently used during the period of 1994 to 1996 was a place to stay. That is the charter boat itself, and it is the view of this Court that these are not the facts, the types of situations that were covered by the wage and hour law. Therefore, I'm going to dismiss Plaintiff's Count II.

The jury returned a verdict in favor of Ayd on his breach of contract claim and unjust enrichment claim, awarding him $76,099.33 on each count. The jury returned a verdict in favor of BHC on the breach of fiduciary duty claim in the amount of $4,000.00.

In response to the jury award, BHC filed a motion for a new trial, judgment notwithstanding the verdict, and remittitur. A hearing was held on the motions on February 26, 1999. The trial judge ruled that she would grant a new trial unless Ayd agreed to accept a remittitur reducing the jury award to $66,237.78. On March 5, 1999, Ayd accepted the remittitur.

Thereafter, BHC filed an appeal and Ayd filed a cross-appeal with the Court of Special Appeals.[4] Ayd argued, *inter*

---

4. In the Court of Special Appeals, BHC argued that the Circuit Court for Baltimore City erred in denying its motion for a judgment notwithstanding the verdict based on BHC's failure to renew its motion for judgment at the close of all evidence. 134 Md.App. 188, 196, 759 A.2d 1091, 1095 (2000). BHC also argued that the trial court erred by failing to credit the full amount of money shown on Ayd's W–2 forms against the jury's award on Ayd's breach of contract claim in ordering the remittitur. *Id.* at 203, 759 A.2d at 1099. BHC also challenged the trial court's decision to admit a photocopy of the Informal Board Action of February 25, 1994 in evidence. *Id.* at 211, 759 A.2d at 1103. In his cross-appeal, Ayd challenged the trial court's decision to order a remittitur, and to dismiss his claim under the Wage Act. *Id.* at 193, 759 A.2d at 1093.

The Court of Special Appeals held that the trial court did not err in denying BHC's motion for a judgment notwithstanding the verdict. *Id.* at 198, 759 A.2d at 1096. With regard to both parties' issues concerning the remittitur, the Court of Special Appeals affirmed the trial court. *Id.* at 199, 759 A.2d at 1096.

The copy of the Informal Board Action of February 25, 1994 had been admitted in a group of corporate records without objection by counsel for BHC. BHC objected to submission of the copy to the jury, and the trial court overruled the untimely objection. The Court of Special Appeals affirmed the trial court's decision. *Id.* at 216, 759 A.2d at 1106. It remanded the case for a determination solely on Ayd's claim under the Wage Act. *Id.* at 211, 759 A.2d at 1103.

Although a plaintiff who accepts a remittitur would ordinarily be barred from seeking appellate review, *see Kneas v. Hecht Company,* 257 Md. 121, 123–24, 262 A.2d 518, 520 (1970), § 12–301 of the Courts and Judicial Proceedings Article of the Maryland Code (1974, 1998 Repl. Vol.) states that "a plaintiff who has accepted a remittitur may cross-appeal from the final judgment." When BHC appealed the judgment of the Circuit Court to the Court of Special Appeals, it opened the door for Ayd's cross-appeal on the Wage Payment and Collection Act. *See Surratt v. Prince George's County,* 320 Md. 439, 461, 578 A.2d 745, 756 (holding that "a plaintiff who has accepted a remittitur may cross-appeal if the defendant in the case has noted an appeal, at least when the plaintiff has not accepted payment of the reduced judgment and filed an order of satisfaction"). Although Ayd accepted the remittitur, Ayd never

*alia,* that the trial court erred as a matter of law in dismissing his claim for treble damages for BHC's violation of the Wage Act. In a reported decision, *Baltimore Harbor Charters, Ltd. v. Ayd,* 134 Md.App. 188, 759 A.2d 1091 (2000), the Court of Special Appeals held that, "administrative, executive, and professional employees, who under the Act may be paid irregularly or less frequently than the standard two-week pay period, are entitled to prompt payment of wages upon termination in accordance with section 3–505, and are entitled to the enforcement remedies provided in section 3–507.1." *Id.* at 208, 759 A.2d at 1101.

BHC filed a Petition for Writ of Certiorari pursuant to § 12–203 of the Maryland Code, Courts and Judicial Proceedings Article (1974, 1998 Repl.Vol.) and Maryland Rule 8–301 (2001), arguing that the trial court properly dismissed Ayd's claim under the Wage Act. We granted the petition and issued a writ of certiorari to consider that issue.[5] We hold that the trial court erred as a matter of law in dismissing the Wage Act claim, and accordingly, we affirm the decision of the Court of Special Appeals to reinstate Ayd's claim under the Wage Act. Therefore, we order that this case be remanded to the Circuit Court for Baltimore City for a trial on Ayd's Wage Act claim.

---

received payment on the judgment and did not file an order of satisfaction in this case.

5. BHC presented the following questions in its Petition for Writ of Certiorari:
 1. Did the Circuit Court properly dismiss the employee's claim under the Wage Collection Act?
 2. Did the Circuit Court err in permitting into evidence a crucial document supposedly indicating a weekly salary for the employee, which document was challenged as a fabrication and which initially was excluded from evidence, because the employer's trial counsel supposedly failed to object to the inclusion of this same item in another exhibit containing corporate documents, which exhibit was admitted?
 3. Did the Circuit Court err in failing to credit, against the revised judgment, the full amount represented by W–2 statements entered into evidence and establishing wages paid to the employee?
 This Court, however, limited the order granting the petition to consideration of Ayd's claims under the Wage Act.

## II. Discussion

In the case *sub judice*, the trial court dismissed Count II of Ayd's complaint, relating to the Wage Act, by partially granting BHC's motion for judgment. Pursuant to Md. Rule 2–519(a), "A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence." We have explained the formalities of the motion for judgment as follows:

The issue traditionally presented by such a motion is a purely legal one—whether, as a matter of law, the evidence produced during [the non-moving party's] case, viewed in a light most favorable to [the non-moving party], is legally sufficient to permit a trier of fact to find that the elements required to be proved by [the non-moving party] in order to recover have been established by whatever standard of proof is applicable. To frame the legal issue, the court must accept the evidence, and all inferences fairly deducible from that evidence, in a light most favorable to [the non-moving party]; it is not permitted to make credibility determinations, to weigh evidence that is in dispute, or to resolve conflicts in the evidence.

*The Driggs Corp. v. Maryland Aviation Admin.*, 348 Md. 389, 402, 704 A.2d 433, 440 (1998).

In cases tried by a jury, a trial court entertaining a motion for judgment must view the evidence and inferences to be made from the evidence in the light most favorable to the non-moving party. *See Metromedia Co. v. WCBM Maryland, Inc.*, 327 Md. 514, 518, 610 A.2d 791, 793 (1992)(quoting Md. Rule 2–519(b)); *Allstate Ins. v. Miller*, 315 Md. 182, 186, 553 A.2d 1268, 1270 (1989); *Impala Platinum Ltd. v. Impala Sales, Inc.*, 283 Md. 296, 327, 389 A.2d 887, 905 (1978). Therefore, in reviewing the trial court's decision to grant BHC's motion for judgment, we must examine the elements of a cause of action under the Wage Act to determine whether there were any disputed issues of material fact or inferences to be made therefrom which would allow a jury to conclude

that Ayd was an employee of BHC entitled to the protections of the Wage Act, and if so, whether Ayd would be entitled to receive treble damages for a violation of the Act along with court costs and reasonable attorneys' fees. *See Nelson v. Carroll,* 355 Md. 593, 600, 735 A.2d 1096, 1099 (1999).

The central component of both parties' arguments before this Court, and the argument which was dispositive for the trial court's dismissal of Ayd's Wage Act claim, is whether Ayd may properly be classified as an employee of BHC entitled to protection under the Wage Act. If Ayd is considered an employee for purposes of the Act, BHC argues that Ayd would not be entitled to treble damages, attorneys' fees, and costs in a successful action to recover his unpaid wages since there was a "bona fide dispute" as to the amount of wages owed to Ayd at the time he resigned his employment with BHC. The resolution of both arguments on this issue is a matter of statutory interpretation.

## A. Ayd's Status as an Employee of BHC

We begin the process of interpretation by examining the plain meaning of the words of the statute to determine if it would be possible for a trier of fact to find that Ayd was an employee of BHC. *See Mid–Atlantic Power Supply Ass'n v. Public Service Comm'n of Maryland,* 361 Md. 196, 203–04, 760 A.2d 1087, 1091 (2000). The "definitions" portion of the Wage Act states as follows:

(a) *In general.*—In this subtitle the following words have the meanings indicated.

(b) *Employer.*—"Employer" includes any person who employs an individual in the State or a successor of the person.

(c) *Wage.*—(1) "Wage" means all compensation that is due to an employee for employment.

(2) "Wage" includes:

(i) a bonus;

(ii) a commission;

(iii) a fringe benefit; or

(iv) any other remuneration promised for service.

Maryland Code, § 3–501 of the Labor and Employment Article (1991, 1999 Repl.Vol.). The statute does not, however, contain a definition of the term "employee" as used therein.

 Because the words of a statute cannot be given full and complete meaning if viewed in isolation, we consider the statute as a whole rather than analyzing the components as separate and distinct from one another, so as to not render any portion of the statutory scheme "meaningless, surplusage, superfluous or nugatory." *Government Employees Insurance Co. v. Insurance Comm'r,* 332 Md. 124, 132, 630 A.2d 713, 717 (1993). As we have stated before,

"when we pursue the context of statutory language, we are not limited to the words of the statute as they are printed. . . . We may and often must consider other external manifestations or persuasive evidence, including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case."

*Tipton v. Partner's Management Co.,* 364 Md. 419, 435, 773 A.2d 488, 497–98 (2001)(quoting *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987))(internal quotations omitted). When the words of the statute are plain and unambiguous, "according to their commonly understood meaning," we need not look to external sources and our inquiry ends. *Chesapeake Amusements, Inc. v. Riddle,* 363 Md. 16, 28, 766 A.2d 1036, 1042 (2001)(quoting *Chesapeake & Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor and City Council of Baltimore,* 343 Md. 567, 578, 683 A.2d 512, 517 (1996)). We may always consider, however, relevant case law, legislative history, and other material concerning the drafting of the statute in order to understand the context in which it was enacted. *See Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 131, 756 A.2d 987, 993

(2000)("the resort to legislative history is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute."). It is important to understand the "particular problem or problems the legislature was addressing, and the objectives it sought to attain" with the creation of the Wage Act. *Sinai Hosp. of Baltimore v. Department of Employment and Training,* 309 Md. 28, 40, 522 A.2d 382, 388 (1987).

In 1966, the General Assembly enacted the Wage Act, codified at Code, Art. 100, § 94 (1957, 1966 Cum.Supp.), relating generally "to wage payment and collection, imposing requirements as to the regularity, frequency and medium of wage payments and permissible deductions therefrom; providing for penalties, and conferring enforcement duties and powers on the Commissioner of the Department of Labor and Industry." 1966 Md. Laws, ch. 686.[6] Thus, the enactment of

---

**6.** The 1966 version of the Maryland Wage Payment and Collection Law states as follows:

(a) *Pay periods; payment on termination of employment.*—All employers engaged in the operation of any business establishment shall establish regular pay periods and shall pay salaried employees, except executive, administrative, and professional employees, and employees paid on an hourly rate at least once every two weeks or twice in each month. Upon termination of employment an employee shall be paid all wages or salaries due him for work performed prior thereto; such payment shall be made to said employee, or to his authorized agent, on or before the date on which he would have been paid for such work had his employment not been terminated.

(b) *Method of payment.*—Payment of wages or salaries shall be in lawful money of the United States or check payable at face value upon demand in lawful money of the United States.

(c) *Authorization to withhold part of wages or salaries; statement of gross wages and deductions.*—No employer shall withhold any part of the wages or salaries of any employee except for payroll, wage or withholding taxes or in accordance with law, without the written and signed authorization of the employee. An employer, upon request of his employee, shall furnish the latter a written statement of the gross wages earned by the employee during any pay period and the amount and purpose of any deductions therefrom.

(d) *Penalty.*—An employer who violates this section shall be fined not less than fifty dollars nor more than three hundred dollars.

(e) *Proceedings to enforce compliance with section.*—The Commissioner of Labor and Industry may require a written complaint of the violation of this section and, with the written and signed consent of an employee, may institute proceedings on behalf of an employee to

the Wage Act gave the State the ability to litigate wage disputes on behalf of private citizens who were suffering the abuse of non-payment of wages from their employers.

The laws relating to Labor and Employment under the Wage Act were recodified in 1991 as part of the general code revision effort. The Overview to House Bill 1, which was enacted as the Labor and Employment Article of the Maryland Code, described the revisions as follows:

The goal in revising is to rewrite the law in a more clear and concise manner without making any substantive changes. Where there is clear legislative intent, inconsistent provisions are reconciled, obsolete language is deleted, and gaps in the statute are filled. Thus, while the language of a revision differs from the derivative statute, the legislative intent does not change.

The General Assembly amended the relevant portions of the Wage Act as to include the definitions of § 3–501, *supra,* as well as the following:

§ 3–502. Payment of wage.

(a) *Pay periods.*

(1) Each employer:

(i) shall set regular pay periods; and

(ii) except as provided in paragraph (2) of this subsection, shall pay each employee at least once in every 2 weeks or twice in each month.

(2) An employer may pay an administrative, executive, or professional employee less frequently than required under paragraph (1)(ii) of this subsection.

(b) *Paydays.* If the regular payday of an employee is a nonworkday, an employer shall pay the employee on the preceding workday.

---

enforce compliance with this section, and to collect any moneys unlawfully withheld from such employee which shall be paid to the employee entitled thereto. Maryland Code, Art. 100, § 94 (1957, 1966 Cum. Supp.)

 (c) *Form of payment.*—Each employer shall pay a wage:

 (1) in United States currency; or

 (2) by a check that, on demand, is convertible at face value into United States currency.

 (d) *Effect of section.* This section does not prohibit the direct deposit of the wage of an employee into a personal bank account of the employee in accordance with an authorization of the employee.

§ 3–505. Payment on termination of employment.

Each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

1991 Md. Laws, ch. 8, § 2, codified at Maryland Code, §§ 3–502 and 3–505 of the Labor and Employment Article (1991).

Although the Act provided for public sanctions against employers who failed to pay employees' wages for the work which they had performed already, budgetary constraints in 1991 rendered State enforcement of the Act a virtual nullity. *See* Hearings on H.B. 1006 Before the House Economic Matters Committee, Floor Report. It then became necessary for the General Assembly to revisit the Wage Act and fashion a new remedy for employees to obtain the wages owed to them by their employers.[7] In 1993, the General Assembly amended

---

**7.** The Fiscal Note for House Bill 1006, dated March 1, 1993, contained the following statement:

"The Wage Payment and Collection Law was enforced by the Employment Standards Service of the Division of Labor and Industry. However, all funding for the Employment Standards Service was eliminated on November 1, 1991, which in turn eliminated the Comissioner of Labor's ability to investigate complaints and determine whether the Law had been violated. Because the Law did not give employees the option of bringing action against their employer, employees have had to rely on general statutes relating to contract disputes. This bill allows employees to bring actions for violations of the Wage Payment and Collection Law."

the Wage Act to provide employees with a private cause of action against employers for failure to pay wages owed to the employee upon termination of the employment relationship. 1993 Md. Laws, ch. 578. The statute, effective October 1, 1993, states:

(a) *In general.*—Notwithstanding any remedy available under § 3–507 of this subtitle, if an employer fails to pay an employee in accordance with § 3–502 or § 3–505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages.

(b) *Award and costs.*—If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

Maryland Code, § 3–507.1 of the Labor and Employment Article.[8] Writing for the Court in *Battaglia v. Clinical Perfusionists, Inc.*, 338 Md. 352, 658 A.2d 680 (1995), Judge Rodowsky noted that the treble damages, costs and fees provisions of § 3–507.1 provide greater incentives for employers to pay employees in-full for services rendered than the common law causes of action in *quantum meruit* or breach of contract. *See id.* at 358–59, 658 A.2d at 683.

The primary argument raised by BHC is that the trial court properly dismissed Ayd's claim under the Wage Act because Ayd was not an employee of BHC, but rather, an officer and did not qualify for the Act's protections. In support of its argument, BHC notes that Ayd served as the President and Treasurer of the corporation, acted in an executive capacity with regard to the operation and activities of *The Royal Blue,* controlled the checkbook of the company, and acted without the daily supervision of Mr. Berman. In essence, Ayd could

---

8. The definitions in § 3–501 were not amended or altered.

have and should have paid himself. Additionally, BHC asserts that in the absence of an actual pattern of payment, Ayd cannot establish that he was an employee entitled to the protections of the Wage Act.

■ As noted above, the Wage Act defines the term "employer" as used in the statute, but does not provide a specific definition of an "employee." [9] BHC contends that as President and Treasurer of the corporation, Ayd is properly classified as an "administrative, executive, or professional employee," as set forth in Md.Code, Lab. & Emp. § 3–502(a)(2), a classification which BHC argues should somehow bar Ayd from the protections of the Wage Act's provisions concerning payment upon termination of employment as set forth in § 3–505. Section 3–502, however, relates solely to the frequency of payment to administrative, executive, and professional em-

---

**9.** The term "employee," however, has been defined legislatively in various forms throughout the Maryland Code to fit the context in which it is used within a given piece of legislation. *See* Maryland Code, § 12–101 of the Business Regulations Article (secondhand precious metal object dealers and pawnbrokers); § 3–405 of the Commercial Law I Article(employer liability for fraudulent endorsement by an employee); § 15–601 of the Commercial Law II Article (attachment of wages); § 5–301 of the Courts and Judicial Proceedings Article (local government tort claims act); § 5–560 of the Family Law Article (child care facilities); § 9–101 of the Financial Institutions Article (savings and loan associations); § 15–302 of the Insurance Article (group health insurance plans); § 15–1102 of the Insurance Article (franchise health insurance policies); § 5.5–101 of the Labor and Employment Article (railroad safety and health); § 5–101 of the Labor and Employment Article (occupational safety and health); § 5–401 of the Labor and Employment Article (access to information about hazardous and toxic substances); § 4–501 of the Labor and Employment Article (employment rights for public safety officers); § 4–601 of the Labor and Employment Article (firefighters and emergency medical personnel); § 17–201 of the State Finance and Procedure Article (public work contracts); § 11–101 of the State Personnel and Pensions Article (employees of the University of Maryland System); § 31–101 of the State Personnel and Pensions Article (participation in Employees' Systems); § 6–102.1 of the Transportation I Article (Drug-free workplace programs for ports); § 7–601 of the Transportation I Article (labor contracts); Art. 24, § 1–107 (1957, 1998 Repl.Vol.)(residency requirements for county or municipal employment); Art. 49B, § 15 (1957, 1998 Repl.Vol.)(Human Relations Commission); Art. 88B, § 2 (1957, 1998 Repl.Vol.)(state police department).

ployees; it does not obviate the Act's protection for such employees. As the Court of Special Appeals noted in its decision below, "we may consider the Legislature's explicit exception of 'administrative, executive, or professional employees' in section 3–502 as evidence that the absence of a similar exception in sections 3–505 and 3–507.1 reflects the Legislature's intent that those provisions would cover all employees." *Baltimore Harbor Charters, Ltd. v. Ayd,* 134 Md.App. at 209, 759 A.2d at 1102. We have long applied the principle of statutory construction, *"expressio unius est exclusio alterius "*—the expression of one thing is the exclusion of another. *See Stanford v. Maryland Police Training and Correctional Comm'n,* 346 Md. 374, 383, 697 A.2d 424, 428 (1997); *Biggus v. Ford Motor Credit Co.,* 328 Md. 188, 214, 613 A.2d 986, 999 (1992); *Gay Investment Co. v. Comi,* 230 Md. 433, 438, 187 A.2d 463, 466 (1963); *Johns v. Hodges,* 62 Md. 525, 538 (1884). Thus, if the General Assembly had intended to exclude administrative, executive and professional employees from the provisions of §§ 3–505 and 3–507.1, or otherwise limit the application of these provisions to that class of employees, it would have expressly done so.[10]

Because the Wage Act is silent with regard to a definition of the word "employee" as used in the statute, and the legislative history does not provide sufficient guidance as to the scope and meaning of the term "employee," we will consider the legislative and interpretive wisdom of other jurisdictions regarding analogous legislative themes. *See Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 146, 753 A.2d 41, 65–66 (2000)(examining case law of other jurisdictions for factors to be considered in determining whether a "special relationship" exists for tort claims arising out of police action or inaction); *Chevy Chase Land Co. v. United States,* 355 Md. 110, 124, 733 A.2d 1055, 1062 (1999)(considering definitions of

---

**10.** For example, the Wage Acts of the District of Columbia and Kentucky exempted individuals employed "in a bona fide executive, administrative, supervisory, or professional capacity...." Ky.Rev.Stat. Ann. § 337.010(2)(a)2 (Michie 1995); D.C.Code Ann. § 36–101(2) (1997).

the railroad term "right of way" as used in other jurisdictions for purposes of interpreting parties' rights under a deed).

In drafting the Wage Act, the Maryland General Assembly neither provided a definition for the term "employee," as used in the statute, nor did it limit the potential scope of the term.[11] In addition to Maryland, forty-two states and the District of Columbia have enacted legislation concerning the payment of wages to employees upon termination of employment.[12] A majority of the jurisdictions provide a definition for the term "employee" as used in the statutes.[13] The remaining jurisdictions use the word "employee" in their statutes, but do not provide specific definitions for the term.[14] Many states in-

---

**11.** Webster's New World College Dictionary (4th Ed.1997) defines employee as "a person hired by another, or by a business firm, etc., to work for wages or salary."

**12.** The following states have not enacted wage payment and collection legislation comparable to the Maryland Wage Payment and Collection Act: Alabama, Arkansas, Florida, Georgia, Mississippi, and Virginia.

**13.** Ariz.Rev.Stat. Ann. § 23–350 (West 1995); Colo.Rev.Stat. Ann. § 8–4–101 (West 1994); Conn. Gen.Stat. § 31–71a (1997); Del.Code Ann. tit. 19, § 1101 (1995); D.C.Code Ann. § 36–101 (1997); Haw.Rev.Stat. § 388–1 (1993); Idaho Code § 45–601 (2000); 820 Ill. Comp. Stat. 115/2–2 (West 1999); Iowa Code Ann. § 91A.2 (West 1996); Kan. Stat. Ann. § 44–313 (2000); Ky.Rev.Stat. Ann. § 337.010 (Michie 1995); Me.Rev.Stat. Ann. tit. 26, § 626 (West 2000); Mass. Gen. Laws Ann. ch. 149, § 148B (Lexis 1999); Mich. Comp. Laws Ann. § 408.471 (West 1999); Mont.Code Ann. § 39–3–201 (1999); Neb.Rev.Stat. § 48–1229 (1998); Nev.Rev.Stat. Ann. § 608.010 (Michie 2000); N.H.Rev.Stat. Ann. § 275:42 (2000); N.J. Stat. Ann. § 34:11–4.1(b) (West 2000); N.M. Stat. Ann. § 50–4–1 (Michie 2000); N.Y. Lab. Law § 190 (Consol.1983); N.C. Gen.Stat. § 95–25.2(4) (1999); Ohio Rev.Code Ann. § 4111.01 (Anderson 2000); Okla. Stat. Ann. tit. 40, § 165.1 (West 1991); Or.Rev. Stat. § 652.210 (1999); R.I. Gen. Laws § 28–14–1 (2000); S.D. Codified Laws § 60–11–2 (Michie 1993); Vt. Stat. Ann. tit. 21, § 341 (2000); W. Va.Code § 21–5–1 (1996).

The District of Columbia and Kentucky statutory provisions define "employee" to exempt any individual employed "in a bona fide executive, administrative, supervisory, or professional capacity. . . ." Ky.Rev. Stat. Ann. § 337.010(2)(a)2 (Michie 1995); D.C.Code Ann. § 36–101(2) (1997).

**14.** Alaska Stat. § 23.05.140 (Lexis 2000); Cal. Lab.Code § 200 et seq. (West 2001); Ind.Code Ann. § 22–2–9–1 et seq. (Michie 1997); La.Rev.

clude a broad definition of employee, such as "any person suffered or permitted to work by an employer." *See e.g.* Conn. Gen.Stat. § 31–71a(2) (1997). Even where a state has not provided a definition of employee in the statute, the application of the statute may be limited through an exclusionary provision. *See* Utah Code Ann. § 34–28–1 (1997)(excluding employees of the state or local governments, and household domestic service from the statutory provision concerning payment of wages at separation from payroll).

Where a statute applies to "employees" but fails to provide a definition for the term "employee," the United States Supreme Court has recognized that this term may be interpreted in harmony with the common-law distinctions observed between the terms employees or agents, and those classified as independent contractors. *See Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 739–40, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811, 824 (1989). In the context of the doctrine of *respondeat superior,* we have stated that "we definitely decided that the test in determining whether a person is a servant or an independent contractor is whether the employer has the right of control over the employee in respect to the work to be performed." *Henkelmann v. Metropolitan Life Insurance Company,* 180 Md. 591, 599, 26 A.2d 418, 422 (1942)(citing *State, to use of Boznango v. Blumenthal–Kahn Electric Co.,* 162 Md. 84, 92, 159 A. 106, 109 (1932)).[15] We have also

---

Stat. Ann. § 23:631 (West 1998); Minn.Stat. Ann. § 181.13 (West 2001); Mo. Ann. Stat. § 290.110 (West 1993); N.D. Cent.Code § 34–14–03 (1987); Pa. Stat. Ann. tit. 43, § 260.1 et seq. (West 1992); S.C.Code Ann. § 41–10–10 et seq. (West 2000); Tenn.Code Ann. § 50–2–103 (1999); Tex. Lab.Code Ann. § 61.014 (West 1996); Utah Code Ann. § 34–28–1 et seq. (1997); Wash. Rev.Code § 49.48.010 (2000); Wis. Stat. Ann. § 109.01 et seq. (West 1997); Wyo. Stat. Ann. § 27–4–101 et seq. (Lexis 1999).

**15.** The Court further discussed its historical analysis and development of the construction of the term "employee" in this context as follows:

[The doctrine of *respondeat superior* ] was founded on the principle that "every man, in the management of his own affairs, whether by himself or by his agents or servants, shall so conduct them as not to injure another; and if he does not, and another thereby sustains

concluded that in the context of the former Maryland Workmen's Compensation Act, Maryland Code (1957, 1985 Repl. Vol.), Art. 101, (repealed in its entirety by 1996 Md. Laws ch. 10, § 15), "[t]he words 'employer' and 'employee' in the statute are equivalent to and synonymous with the words 'master' and 'servant.' " *Brady v. Ralph Parsons Co.*, 308 Md. 486, 499, 520 A.2d 717, 724 (1987). We continued, as follows:

> ... the test for determining the existence of an employer and employee relationship under the Act is the same as the common law rules for ascertaining the relation of master and servant. That test inquires whether the employer has the right to control and direct the servant in the performance of his work and in the manner in which the work is to be done. In administering this test, we have established five criteria to consult for guidance. These include: (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control

---

damage, he shall answer it." *Farwell v. Boston & Worcester R.R. Corp.*, 4 Metc., 45 Mass., 49, 55, 38 Am. Dec. 339, 340. The courts, however, have regarded the doctrine with jealousy and have confined it within limits as narrow as are consistent with the true interests of society. *Wood, Master and Servant*, 2d Ed., Sec. 277. In 1840 the courts in England began to relax the doctrine by holding that it does not apply to independent contractors. In 1869 the Court of Appeals of Maryland, in an opinion by Judge Alvey, observed that the doctrine had been modified by the English decisions, and held that it is not applicable where the employee is "a contractor, pursuing an independent employment, and by the terms of the contract, is free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about the work, exclusive of the control and direction, in this respect, of the party for whom the work is being done." *Deford v. State, to Use of Keyser*, 30 Md. 179, 203. In 1884 the Court of Appeal[s] said that the theory upon which liability under the doctrine is predicated is that the master is constructively present, so that the negligence of the servant is the negligence of the master. *Adams v. Cost*, 62 Md. 264, 267, 50 Am. Rep. 211. In 1901 this Court stated that an essential element of the relation of master and servant is that the master shall have control of the employment and all of its details. *Baltimore Boot & Shoe Mfg. Co. v. Jamar*, 93 Md. 404, 413, 49 A. 847, 850, 86 Am. St. Rep. 428.

*Henkelmann v. Metropolitan Life Insurance Company*, 180 Md. at 598–99, 26 A.2d at 422.

the employee's conduct, and (5) whether the work is part of the regular business of the employer.

*Id.* (internal citations omitted).

The analysis employed by this Court in defining the term "employee" under the doctrine of *respondeat superior*, and the factors emphasized in *Brady* have been discussed in the context of Wage Act claims in other jurisdictions. While none of the wage payment and collection statutes of other jurisdictions contains the same language as Maryland's Wage Act, California's statute does contain provisions similar in force and effect to the language contained in the Maryland Act. *See* Cal. Labor Code § 200 et seq. (West 2001). Like the Maryland Wage Act, California does not define the term "employee" in its statute, and it defines the term "wages" as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Lab.Code § 200 (West 2001). Regarding the termination of employment by an employer, the California statute states that, "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab.Code § 201. Where an employee has resigned his or her employment, the California statute provides that, "If an employee not having a written contract for a definite period quits his employment, his wages shall become due and payable not later than seventy-two hours thereafter, unless the employee has given seventy-two hours previous notice of his intention to quit, in which case the employee is entitled to his wages at the time of quitting." Cal. Lab.Code § 202.

In case law interpreting whether a person is an employee entitled to protection under the California statute, the Superior Court of California stated as follows:

In determining whether one is an employee or an independent contractor, the California Supreme Court has adopted the test of the Restatement of Agency, section 220: In determining whether one who performs services for another

is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Zaremba v. Miller,* 169 Cal.Rptr. 688, 689, 113 Cal.App.3d Supp. 1 (1980)(internal citations and quotations omitted).[16] In

---

**16.** As commonly used in modern statutes, the term "employee" is analogous to the class of person historically described or defined as a servant. *See* Restatement (Second) of Agency, § 2, comment d.

Restatement (Second) of Agency, § 220 defines a servant as follows:
(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;

applying these factors, the court emphasized that "the most crucial consideration is the right to exercise complete control over the work, including its details." *Id.* We have applied with equal force, an emphasis on the element concerning the master or employer's right to control the work of the servant or employee in cases relating to other statutes and common-law causes of action. *See Mackall v. Zayre Corp.,* 293 Md. 221, 230, 443 A.2d 98, 103 (1982); *Gallagher's Estate v. Battle,* 209 Md. 592, 602, 122 A.2d 93, 97–98 (1956).

■ Other jurisdictions have applied factors similar to those used by the California court in determining the existence of an employer-employee relationship for purposes of wage collection actions brought by former employees. *See Cavic v. Pioneer Astro Industries, Inc.,* 825 F.2d 1421, 1426 (10th Cir.1987); *Doherty v. Kahn,* 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163, 173 (1 Dist.1997)(explaining that the statute does not apply to employees who are free from control and direction over the performance of their work); *Lorentz v. Coblentz,* 600 So.2d 1376, 1381 (La.App. 1st Cir.1992)(focusing on "selection and engagement, payment of wages, power of dismissal, and control" in resolving a person's employment status); *Taylor v. Kennedy,* 719 A.2d 525, 527–28 (Me.1998)(applying common law "right to control" test to determine if plaintiff was an employee within the statute as set forth in *Murray's Case,* 130 Me. 181, 154 A. 352, 354 (1931)); *Cook v. Burke,* 693 S.W.2d 857, 861 (Mo.App.1985)(finding plaintiff was an employee where al-

---

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

though she served in a management capacity, she had no ownership in the business and no share in the profits, and no "discretion to affect the general policy of the business").

The factors considered in this Court's opinions regarding the doctrine of *respondeat superior* and construction of the term "employee" under the principles enumerated in Restatement (Second) of Agency, as well as the case law interpreting the term "employee" under the wage act statutes of other jurisdictions provide an appropriate framework for determining whether an individual is an employee covered by the Maryland Wage Payment and Collection Act. Such factors include:

1. Whether the employer actually exercised or had the right to exercise control over the performance of the individual's work;

2. Whether the individual's service is either outside all the usual course of business of the enterprise for which such service is performed;

3. Whether the individual is customarily engaged in an independently established trade, occupation, profession, or business;

4. Whether it is the employer or the employee who supplies the instrumentalities, tools, and location for the work to be performed;

5. Whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf; and

6. Whether the individual held an ownership interest in the business such that the individual had the ability and discretion to affect the general policies and procedures of the business.

*See Brady,* 308 Md. at 499, 510, 520 A.2d at 724, 730; *Mackall,* 293 Md. at 230, 443 A.2d at 103; *Gallagher's Estate,* 209 Md. at 600–01, 122 A.2d at 97; *Henkelmann,* 180 Md. at 598–99, 26 A.2d at 422; Restatement (Second) of Agency § 2, comment d, and § 220.

On remand, there are many factual nuances for the finder of fact to consider in applying these six factors to determine whether Ayd should be classified as an employee of BHC. First, did Berman, as the Vice President and sole shareholder of BHC have the right to exercise control over the performance of Ayd's work? The emphasis on the right to exercise control is whether Berman could have exercised control over Ayd, not whether he actually did. If believed by the fact finder, testimony adduced by Ayd at trial supported the proposition that throughout his ownership of BHC, Berman had the ability to direct and exercise control over Ayd.

Second, did the services Ayd performed for BHC, including but not limited to administrative services, repairs, maintenance, sales, and captaining *The Royal Blue* fall within the usual course of operating a charter boat business? According to other evidence at trial, if credited by the fact finder, Berman named Ayd as President of BHC in order to give potential customers the sense that they were dealing with someone who had greater authority in the operation of BHC. Acting in his capacity as President, Ayd worked as a salesman for BHC. He also performed all necessary repairs and maintenance on *The Royal Blue* to prepare the vessel for charter trips.

The third factor concerns whether Ayd was customarily working in his own interest, albeit also being beneficial to BHC. In other words, was his status similar to that of an independent contractor? It is clear, if the testimony adduced at trial is accepted by the fact finder, that Ayd was not an independent contractor.

The fourth factor asks, did Ayd use any of his own equipment in providing maintenance for *The Royal Blue*, which also served as his residence? There was testimony at trial indicating that Ayd used some of his own equipment in repairing and maintaining *The Royal Blue*, and also used a computer and software belonging to BHC in performing his bookkeeping and administrative functions.

In examining the fifth factor concerning the payment of wages, BHC argues that the payments which it made to Ayd from the winter of 1994 until Ayd ceased working for BHC in September 1996 do not suffice to establish a pattern of payment by which a finder of fact could determine that Ayd was an employee of BHC entitled to the protections of the Wage Act. We disagree. The facts of this case indicate that Ayd had received some payment for his services in the form of the monthly administrative salary of $200.00, several payments of the disputed weekly salary amount of $576.92, and captain's fees in the amount of $200.00 per charter, albeit not on a regular schedule and not in the full amount owed for services performed. The Wage Act contains no provision which would exclude someone who is otherwise an employee from statutory protection based on the employer's failure to set regular pay periods. *See* § 3–502. To follow BHC's argument that the absence of a regular pattern of payment should preclude an individual from being classified as an employee would undermine the protective purposes of the Wage Act by leaving those employees who suffer the most egregious abuse of non-payment of wages by their employers from ever recovering the money owed to them for services rendered. *See Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 808, 709 A.2d 1301, 1303 (1998)("we avoid construing a statute so as to lead to results that are unreasonable, illogical, or inconsistent with common sense")(citing *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 445, 697 A.2d 455, 459 (1997); *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994); *Holman v. Kelly Catering,* 334 Md. 480, 487, 639 A.2d 701, 705 (1994); *Kaczorowski,* 309 Md. at 516, 525 A.2d at 633).

BHC contends that Ayd is not entitled to the salary which he should have been paid during his employment with BHC because Ayd controlled the accounting books and checking account for the corporation and refrained from paying himself a regular salary. The testimony at trial showed that Berman knew that Ayd had not been paid due to BHC's financial difficulties. As the business relationship between Berman and Ayd deteriorated during the summer of 1996, Berman sought

control of the checking account. When Ayd resolved to terminate his employment with BHC, Berman had sole authority over the checking account. Thus, when he left his employment with BHC, Ayd did not have the access by which to pay himself the money owed to him by the company.

The Missouri Court of Appeals examined an argument factually similar to the payment issues involved in the instant case in *Cook v. Burke,* 693 S.W.2d 857 (Mo.App.1985). In *Cook,* the former employee, who had been in charge of payroll and timekeeping as part of her work responsibilities, held her payroll checks for a period of three months with her employer's knowledge, because the business experienced chronic financial difficulties leaving insufficient funds in the business's bank account to cover payment of her salary. *Id.* at 859. When the former employee was discharged, however, the Missouri court found that she ceased being payroll manager, and became unable to pay herself the wages which she was owed; thus the employer remained responsible for the payment of all wages due on the date of discharge. *Id.* at 860–61. The reasoning applied by the Missouri court in *Cook* may be applied with equal force and effect to the matter now before us. If a trier of fact concludes that Ayd is an employee entitled to protection under the Wage Act, BHC cannot escape liability for the wages owed based on Ayd's conduct in refraining from taking his salary during BHC's protracted periods of financial instability.

Finally, under the sixth factor of the employee analysis, the trier of fact would have to determine if Ayd did have an ownership interest in BHC which would have given him the ability and discretion to affect the general policies and procedures of the business. At trial, both parties admitted that from February 1994 to September 9, 1996, Ayd held no ownership interest in BHC whatsoever.

We hold, therefore, that the issue of whether Ayd was an employee under the Wage Act was withheld improperly from the jury by the trial court's dismissal.

## B. Bona Fide Dispute

BHC's final contention is that the treble damages, attorneys' fees and costs provisions of § 3–507.1 of the Wage Act do not apply to situations such as the case at bar, where a bona fide dispute exists between the employer and the employee. The existence of a bona fide dispute under § 3–507.1 is a question of fact left for resolution by the jury, not the trial judge. *See Admiral Mortgage v. Cooper,* 357 Md. 533, 551, 745 A.2d 1026, 1035 (2000). In *Admiral Mortgage,* we explained the definition and existence of a "bona fide dispute" as follows:

> All of the definitions articulated by the courts focus really on whether the party making or resisting the claim has a good faith basis for doing so, whether there is a legitimate dispute over the validity of the claim or the amount that is owing. The issue is not whether a party acted fraudulently; fraud is certainly inconsistent with the notion of "bona fide" or "good faith," but it is not required to establish an absence of good faith. The question, simply, is whether there was sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay ... [the employee] ...

*Id.* at 543, 745 A.2d at 1031.

In *Admiral Mortgage,* we also explained that the existence of a bona fide dispute under § 3–507.1 affects whether treble damages, attorneys' fees and costs may be awarded at the discretion of the jury. *Id.* at 542, 745 A.2d at 1030–31. A jury may find that a bona fide dispute existed between an employer and an employee over the amount of wages owed to the employee at the time of termination of employment while also finding that the employer owes the employee money for services rendered. Ayd's recovery of the weekly salary of $576.92, however, is not dependent upon the existence of a bona fide dispute between Ayd and BHC. *Id.* at 541, 745 A.2d at 1030. A finding by the jury that a bona fide dispute existed at the time of termination of employment ends any inquiry as

to whether the employee would be entitled to receive additional damages according to the provisions of § 3–507.1.

At trial, both Ayd and Berman agreed that Ayd was to be paid $200.00 per month for administrative services, and $200.00 each time he captained a charter trip on *The Royal Blue,* but disputed that Ayd was owed a $576.92 weekly salary. The statute clearly states that when employment is terminated, employers must pay employees "all wages due for work that the employee performed before the termination of employment." § 3–505. Although BHC paid the monthly administrative fee and captain's fees to Ayd on a more regular basis than the contested $576.92 weekly salary, BHC had not paid the undisputed amounts in full to Ayd at the time of termination of employment. The failure to pay an employee wages conceded to be owed to him for work performed prior to the termination of his employment is a violation of § 3–505 of the Wage Act, regardless of which party terminates the employment arrangement, and regardless of whether the termination was in violation of an employment contract. *See Battaglia,* 338 Md. at 362–63, 658 A.2d at 685–86. The jury however, may consider the employer's ability to pay the disputed amount at the time of discharge in determining whether the employer acted with good faith concerning the existence of a bona fide dispute under § 3–507.1.

In addition, the "bona fide dispute" provision of § 3–507.1 contains no language which would permit BHC to withhold the amounts it conceded it owed to Ayd. Thus, where an employer alleges the existence of a bona fide dispute as to the total amount of wages owed to an employee (in this case, the weekly salary of $576.92) yet concedes that a certain amount of wages are due (the $200.00 per month for administrative services and $200.00 per charter trip that captained), the employer acts at his or her peril in failing to pay the conceded amount. Even where the finder of fact agrees with the employer concerning the total sum owed, the penalty provision of § 3–507.1, which allows for an employee to be awarded up to three times the amount of wages owed, will apply to those

amounts which were not in dispute but for which the employer ·failed to make timely payment upon termination as specified in § 3–505.

 Based on certain facts the evidence presented at trial, it would be possible for a reasonable trier of fact to conclude that BHC did not withhold payment of the wages owed to Ayd at the time he terminated his employment as a result of a bona fide dispute. Matters of witness credibility and a weighing of the facts to determine the existence of a bona fide dispute are properly left for resolution by the jury on remand.

Accordingly, we remand this case for a trial solely on Ayd's claim under the Maryland Wage Payment and Collection Law.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTION TO VACATE THAT PART OF THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY DISMISSING RESPONDENT'S CLAIM UNDER THE MARYLAND WAGE PAYMENT AND COLLECTION ACT AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL OF THAT CLAIM IN ACCORDANCE WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.*